INGRAHAM ET AL. *v.* WRIGHT ET AL.

No. 75–6527.   Argued November 2–3, 1976—Decided April 19, 1977

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 683. STEVENS, J., filed a dissenting opinion, *post*, p. 700.

*Bruce S. Rogow* argued the cause for petitioners. With him on the briefs were *Howard W. Dixon* and *Peter M. Siegel.*

*Frank A. Howard, Jr.,* argued the cause and filed a brief for respondents.*

Mr. Justice Powell delivered the opinion of the Court.

This case presents questions concerning the use of corporal punishment in public schools: First, whether the paddling of students as a means of maintaining school discipline constitutes cruel and unusual punishment in violation of the Eighth Amendment; and, second, to the extent that paddling is constitutionally permissible, whether the Due Process Clause of the Fourteenth Amendment requires prior notice and an opportunity to be heard.

I

Petitioners James Ingraham and Roosevelt Andrews filed the complaint in this case on January 7, 1971, in the United States District Court for the Southern District of Florida.[1] At the time both were enrolled in the Charles R. Drew Junior High School in Dade County, Fla., Ingraham in the eighth grade and Andrews in the ninth. The complaint contained three counts, each alleging a separate cause of action for deprivation of constitutional rights, under 42 U. S. C. §§ 1981–1988. Counts one and two were individual actions for damages by Ingraham and Andrews based on paddling incidents that allegedly occurred in October 1970 at Drew Junior High School. Count three was a class action for declaratory and

---

*Michael Nussbaum, Lucien Hilmer, Ronald G. Precup,* and *David Rubin* filed a brief for the National Education Assn. as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Leon Fieldman* for the National School Boards Assn.; and by *Tobias Simon* and *Elizabeth J. du Fresne* for the United Teachers of Dade, Local 1974, AFT, AFL–CIO.

*Gertrude M. Bacon* filed a brief for the American Psychological Association Task Force on the Rights of Children and Youths as *amicus curiae.*

[1] As Ingraham and Andrews were minors, the complaint was filed in the names of Eloise Ingraham, James' mother, and Willie Everett, Roosevelt's father.

injunctive relief filed on behalf of all students in the Dade County schools.[2] Named as defendants in all counts were respondents Willie J. Wright (principal at Drew Junior High School), Lemmie Deliford (an assistant principal), Solomon Barnes (an assistant to the principal), and Edward L. Whigham (superintendent of the Dade County School System).[3]

Petitioners presented their evidence at a week-long trial before the District Court. At the close of petitioners' case, respondents moved for dismissal of count three "on the ground that upon the facts and the law the plaintiff has shown no right to relief," Fed. Rule Civ. Proc. 41 (b), and for a ruling that the evidence would be insufficient to go to a jury on counts one and two.[4] The District Court granted the motion as to all three counts, and dismissed the complaint without hearing evidence on behalf of the school authorities. App. 142–150.

---

[2] The District Court certified the class, under Fed. Rules Civ. Proc. 23 (b)(2) and (c)(1), as follows: " 'All students of the Dade County School system who are subject to the corporal punishment policies issued by the Defendant, Dade County School Board . . . .' " App. 17. One student was specifically excepted from the class by request.

[3] The complaint also named the Dade County School Board as a defendant, but the Court of Appeals held that the Board was not amenable to suit under 42 U. S. C. §§ 1981–1988 and dismissed the suit against the Board for want of jurisdiction. 525 F. 2d 909, 912 (CA5 1976). This aspect of the Court of Appeals' judgment is not before us.

[4] Petitioners had waived their right to jury trial on the claims for damages in counts one and two, but respondents had not. The District Court proceeded initially to hear evidence only on count three, the claim for injunctive relief. At the close of petitioners' case, however, the parties agreed that the evidence offered on count three (together with certain stipulated testimony) would be considered, for purposes of a motion for directed verdict, as if it had also been offered on counts one and two. It was understood that respondents could reassert a right to jury trial if the motion were denied. App. 142.

Petitioners' evidence may be summarized briefly. In the 1970–1971 school year many of the 237 schools in Dade County used corporal punishment as a means of maintaining discipline pursuant to Florida legislation and a local School Board regulation.[5] The statute then in effect authorized limited corporal punishment by negative inference, proscribing punishment which was "degrading or unduly severe" or which was inflicted without prior consultation with the principal or the teacher in charge of the school. Fla. Stat. Ann. § 232.27 (1961).[6] The regulation, Dade County School Board Policy

[5] The evidence does not show how many of the schools actually employed corporal punishment as a means of maintaining discipline. The authorization of the practice by the School Board extended to 231 of the schools in the 1970–1971 school year, but at least 10 of those schools did not administer corporal punishment as a matter of school policy. *Id.*, at 137–139.

[6] In the 1970–1971 school year, § 232.27 provided:

"Each teacher or other member of the staff of any school shall assume such authority for the control of pupils as may be assigned to him by the principal and shall keep good order in the classroom and in other places in which he is assigned to be in charge of pupils, but he shall not inflict corporal punishment before consulting the principal or teacher in charge of the school, and in no case shall such punishment be degrading or unduly severe in its nature. . . ."

Effective July 1, 1976, the Florida Legislature amended the law governing corporal punishment. Section 232.27 now reads:

"Subject to law and to the rules of the district school board, each teacher or other member of the staff of any school shall have such authority for the control and discipline of students as may be assigned to him by the principal or his designated representative and shall keep good order in the classroom and in other places in which he is assigned to be in charge of students. If a teacher feels that corporal punishment is necessary, at least the following procedures shall be followed:

"(1) The use of corporal punishment shall be approved in principle by the principal before it is used, but approval is not necessary for each specific instance in which it is used.

"(2) A teacher or principal may administer corporal punishment only in the presence of another adult who is informed beforehand, and in the student's presence, of the reason for the punishment.

"(3) A teacher or principal who has administered punishment shall,

5144, contained explicit directions and limitations.[7] The authorized punishment consisted of paddling the recalcitrant student on the buttocks with a flat wooden paddle measuring less than two feet long, three to four inches wide, and about one-half inch thick. The normal punishment was limited to one to five "licks" or blows with the paddle and resulted in

upon request, provide the pupil's parent or guardian with a written explanation of the reason for the punishment and the name of the other [adult] who was present." Fla. Stat. Ann. § 232.27 (1977) (codifier's notation omitted).

Corporal punishment is now defined as "the moderate use of physical force or physical contact by a teacher or principal as may be necessary to maintain discipline or to enforce school rules." § 228.041 (28). The local school boards are expressly authorized to adopt rules governing student conduct and discipline and are directed to make available codes of student conduct. § 230.23 (6). Teachers and principals are given immunity from civil and criminal liability for enforcing disciplinary rules, "[e]xcept in the case of excessive force or cruel and unusual punishment . . . ." § 232.275.

[7] In the 1970–1971 school year, Policy 5144 authorized corporal punishment where the failure of other means of seeking cooperation from the student made its use necessary. The regulation specified that the principal should determine the necessity for corporal punishment, that the student should understand the seriousness of the offense and the reason for the punishment, and that the punishment should be administered in the presence of another adult in circumstances not calculated to hold the student up to shame or ridicule. The regulation cautioned against using corporal punishment against a student under psychological or medical treatment, and warned that the person administering the punishment "must realize his own personal liabilities" in any case of physical injury. App. 15.

While this litigation was pending in the District Court, the Dade County School Board amended Policy 5144 to standardize the size of the paddles used in accordance with the description in the text, to proscribe striking a child with a paddle elsewhere than on the buttocks, to limit the permissible number of "licks" (five for elementary and intermediate grades and seven for junior and senior grades), and to require a contemporaneous explanation of the need for the punishment to the student and a subsequent notification to the parents. App. 126–128.

no apparent physical injury to the student. School authorities viewed corporal punishment as a less drastic means of discipline than suspension or expulsion. Contrary to the procedural requirements of the statute and regulation, teachers often paddled students on their own authority without first consulting the principal.[8]

Petitioners focused on Drew Junior High School, the school in which both Ingraham and Andrews were enrolled in the fall of 1970. In an apparent reference to Drew, the District Court found that "[t]he instances of punishment which could be characterized as severe, accepting the students' testimony as credible, took place in one junior high school." App. 147. The evidence, consisting mainly of the testimony of 16 students, suggests that the regime at Drew was exceptionally harsh. The testimony of Ingraham and Andrews, in support of their individual claims for damages, is illustrative. Because he was slow to respond to his teacher's instructions, Ingraham was subjected to more than 20 licks with a paddle while being held over a table in the principal's office. The paddling was so severe that he suffered a hematoma[9] requiring medical attention and keeping him out of school for several days.[10] Andrews was paddled several times for minor infractions. On two occasions he was struck on his arms, once depriving him of the full use of his arm for a week.[11]

---

[8] 498 F. 2d 248, 255, and n. 7 (1974) (original panel opinion), vacated on rehearing, 525 F. 2d 909 (1976); App. 48, 138, 146; Exhibits 14, 15.

[9] Stedman's Medical Dictionary (23d ed. 1976) defines "hematoma" as "[a] localized mass of extravasated blood that is relatively or completely confined within an organ or tissue . . . ; the blood is usually clotted (or partly clotted), and, depending on how long it has been there, may manifest various degrees of organization and decolorization."

[10] App. 3–4, 18–20, 68–85, 129–136.

[11] Id., at 4–5, 104–113. The similar experiences of several other students at Drew, to which they individually testified in the District Court, are summarized in the original panel opinion in the Court of Appeals, 498 F. 2d, at 257–259.

The District Court made no findings on the credibility of the students' testimony. Rather, assuming their testimony to be credible, the court found no constitutional basis for relief. With respect to count three, the class action, the court concluded that the punishment authorized and practiced generally in the county schools violated no constitutional right. *Id.*, at 143, 149. With respect to counts one and two, the individual damages actions, the court concluded that while corporal punishment could in some cases violate the Eighth Amendment, in this case a jury could not lawfully find "the elements of severity, arbitrary infliction, unacceptability in terms of contemporary standards, or gross disproportion which are necessary to bring 'punishment' to the constitutional level of 'cruel and unusual punishment.' " *Id.*, at 143.

A panel of the Court of Appeals voted to reverse. 498 F. 2d 248 (CA5 1974). The panel concluded that the punishment was so severe and oppressive as to violate the Eighth and Fourteenth Amendments, and that the procedures outlined in Policy 5144 failed to satisfy the requirements of the Due Process Clause. Upon rehearing, the en banc court rejected these conclusions and affirmed the judgment of the District Court. 525 F. 2d 909 (1976). The full court held that the Due Process Clause did not require notice or an opportunity to be heard:

> "In essence, we refuse to set forth, as constitutionally mandated, procedural standards for an activity which is not substantial enough, on a constitutional level, to justify the time and effort which would have to be expended by the school in adhering to those procedures or to justify further interference by federal courts into the internal affairs of public schools." *Id.*, at 919.

The court also rejected the petitioners' substantive contentions. The Eighth Amendment, in the court's view, was simply inapplicable to corporal punishment in public

schools. Stressing the likelihood of civil and criminal liability in state law, if petitioners' evidence were believed, the court held that "[t]he administration of corporal punishment in public schools, whether or not excessively administered, does not come within the scope of Eighth Amendment protection." *Id.*, at 915. Nor was there any substantive violation of the Due Process Clause. The court noted that "[p]addling of recalcitrant children has long been an accepted method of promoting good behavior and instilling notions of responsibility and decorum into the mischievous heads of school children." *Id.*, at 917. The court refused to examine instances of punishment individually:

> "We think it a misuse of our judicial power to determine, for example, whether a teacher has acted arbitrarily in paddling a particular child for certain behavior or whether in a particular instance of misconduct five licks would have been a more appropriate punishment than ten licks. . . ." *Ibid.*

We granted certiorari, limited to the questions of cruel and unusual punishment and procedural due process. 425 U. S. 990.[12]

## II

In addressing the scope of the Eighth Amendment's prohibition on cruel and unusual punishment, this Court has found it useful to refer to "[t]raditional common-law concepts," *Powell* v. *Texas*, 392 U. S. 514, 535 (1968) (plurality opinion), and to the "attitude[s] which our society has traditionally taken." *Id.*, at 531. So, too, in defining the require-

---

[12] We denied review of a third question presented in the petition for certiorari:

"Is the infliction of severe corporal punishment upon public school students arbitrary, capricious and unrelated to achieving any legitimate educational purpose and therefore violative of the Due Process Clause of the Fourteenth Amendment?" Pet. for Cert. 2.

ments of procedural due process under the Fifth and Fourteenth Amendments, the Court has been attuned to what "has always been the law of the land," *United States* v. *Barnett,* 376 U. S. 681, 692 (1964), and to "traditional ideas of fair procedure." *Greene* v. *McElroy,* 360 U. S. 474, 508 (1959). We therefore begin by examining the way in which our traditions and our laws have responded to the use of corporal punishment in public schools.

The use of corporal punishment in this country as a means of disciplining schoolchildren dates back to the colonial period.[13] It has survived the transformation of primary and secondary education from the colonials' reliance on optional private arrangements to our present system of compulsory education and dependence on public schools.[14] Despite the general abandonment of corporal punishment as a means of punishing criminal offenders,[15] the practice continues to play a role in the public education of schoolchildren in most parts of the country.[16] Professional and public opinion is sharply divided on the practice,[17] and has been for more than

---

[13] See H. Falk, Corporal Punishment 11–48 (1941); N. Edwards & H. Richey, The School in the American Social Order 115–116 (1947).

[14] Public and compulsory education existed in New England before the Revolution, see *id.,* at 50–68, 78–81, 97–113, but the demand for free public schools as we now know them did not gain momentum in the country as a whole until the mid-1800's, and it was not until 1918 that compulsory school attendance laws were in force in all the States. See *Brown* v. *Board of Education,* 347 U. S. 483, 489 n. 4 (1954), citing Cubberley, Public Education in the United States 408–423, 563–565 (1934 ed.); cf. *Wisconsin* v. *Yoder,* 406 U. S. 205, 226, and n. 15 (1972).

[15] See *Jackson* v. *Bishop,* 404 F. 2d 571, 580 (CA8 1968); Falk, *supra,* at 85–88.

[16] See K. Larson & M. Karpas, Effective Secondary School Discipline 146 (1963); A. Reitman, J. Follman, & E. Ladd, Corporal Punishment in the Public Schools 2–5 (ACLU Report 1972).

[17] For samplings of scholarly opinion on the use of corporal punishment in the schools, see F. Reardon & R. Reynolds, Corporal Punishment in

a century.[18] Yet we can discern no trend toward its elimination.

At common law a single principle has governed the use of corporal punishment since before the American Revolution: Teachers may impose reasonable but not excessive force to discipline a child.[19] Blackstone catalogued among the "absolute rights of individuals" the right "to security from the corporal insults of menaces, assaults, beating, and wounding," 1 W. Blackstone, Commentaries *134, but he did not regard it a "corporal insult" for a teacher to inflict "moderate correction" on a child in his care. To the extent that force was "necessary to answer the purposes for which [the teacher] is employed," Blackstone viewed it as "justifiable or lawful." *Id.*, at *453; 3 *id.*, at *120. The basic doctrine has not changed. The prevalent rule in this country today privileges such force as a teacher or administrator "reasonably believes to be necessary for [the child's] proper control, training, or education." Restatement (Second) of Torts § 147 (2) (1965); see *id.*, § 153 (2). To the extent that the force is excessive or unreasonable, the educator in virtually all States is subject to possible civil and criminal liability.[20]

---

Pennsylvania 1–2, 34 (1975); National Education Association, Report of the Task Force on Corporal Punishment (1972); K. James, Corporal Punishment in the Public Schools 8–16 (1963). Opinion surveys taken since 1970 have consistently shown a majority of teachers and of the general public favoring moderate use of corporal punishment in the lower grades. See Reardon & Reynolds, *supra,* at 2, 23–26; Delaware Department of Public Instruction, Report on the Corporal Punishment Survey 48 (1974); Reitman, Follman, & Ladd, *supra,* at 34–35; National Education Association, *supra,* at 7.

[18] See Falk, *supra,* 66–69; cf. *Cooper* v. *McJunkin,* 4 Ind. 290 (1853).

[19] See 1 F. Harper & F. James, Law of Torts § 3.20, pp. 288–292 (1956); Proehl, Tort Liability of Teachers, 12 Vand. L. Rev. 723, 734–738 (1959); W. Prosser, Law of Torts 136–137 (4th ed. 1971).

[20] See cases cited n. 28, *infra.* The criminal codes of many States include provisions explicitly recognizing the teacher's common-law privilege

Although the early cases viewed the authority of the teacher as deriving from the parents,[21] the concept of parental delegation has been replaced by the view—more consonant with compulsory education laws—that the State itself may impose such corporal punishment as is reasonably necessary "for the proper education of the child and for the maintenance of group discipline." 1 F. Harper & F. James, Law of Torts § 3.20, p. 292 (1956).[22] All of the circumstances are to be taken into account in determining whether the punishment is reasonable in a particular case. Among the most important considerations are the seriousness of the offense, the attitude and past behavior of the child, the nature and severity of the punishment, the age and strength of the child, and the availability of less severe but equally effective means of discipline. *Id.*, at 290–291; Restatement (Second) of Torts § 150, Comments *c–e*, p. 268 (1965).

Of the 23 States that have addressed the problem through legislation, 21 have authorized the moderate use of corporal punishment in public schools.[23] Of these States only a few

to inflict reasonable corporal punishment. *E. g.*, Ariz. Rev. Stat. Ann. § 13–246 (A)(1) (1956); Conn. Gen. Stat. § 53a–18 (1977); Neb. Rev. Stat. § 28–840 (2) (1975); N. Y. Penal Law § 35.10 (McKinney 1975 and Supp. 1976); Ore. Rev. Stat. § 161.205 (1) (1975).

[21] See Proehl, *supra*, at 726, and n. 13.

[22] Today, corporal punishment in school is conditioned on parental approval only in California. Cal. Educ. Code § 49001 (West Supp. 1977). Cf. *Morrow* v. *Wood*, 35 Wis. 59 (1874). This Court has held in a summary affirmance that parental approval of corporal punishment is not constitutionally required. *Baker* v. *Owen*, 423 U. S. 907 (1975), aff'g 395 F. Supp. 294 (MDNC).

[23] Cal. Educ. Code §§ 49000–49001 (West Supp. 1977); Del. Code Ann., Tit. 14, § 701 (Supp. 1976); Fla. Stat. Ann. § 232.27 (1977); Ga. Code Ann. §§ 32–835, 32–836 (1976); Haw. Rev. Stat. §§ 298–16 (1975 Supp.), 703–309 (2) (Spec. Pamphlet 1975); Ill. Ann. Stat., c. 122, §§ 24–24, 34–84a (1977 Supp.); Ind. Code Ann. § 20–8.1–5–2 (1975); Md. Ann. Code, Art. 77, § 98B (1975) (in specified counties); Mich. Comp. Laws Ann., § 340.756

have elaborated on the common-law test of reasonableness, typically providing for approval or notification of the child's parents,[24] or for infliction of punishment only by the principal[25] or in the presence of an adult witness.[26] Only two States, Massachusetts and New Jersey, have prohibited all corporal punishment in their public schools.[27] Where the legislatures have not acted, the state courts have uniformly preserved the common-law rule permitting teachers to use reasonable force in disciplining children in their charge.[28]

Against this background of historical and contemporary approval of reasonable corporal punishment, we turn to the constitutional questions before us.

---

(1970); Mont. Rev. Codes Ann. § 75–6109 (1971); Nev. Rev. Stat. § 392.465 (1973); N. C. Gen. Stat. § 115–146 (1975); Ohio Rev. Code Ann. § 3319.41 (1972); Okla. Stat. Ann., Tit. 70, § 6–114 (1972); Pa. Stat. Ann., Tit. 24, § 13–1317 (Supp. 1976); S. C. Code § 59–63–260 (1977); S. D. Compiled Laws Ann. § 13–32–2 (1975); Vt. Stat. Ann., Tit. 16, § 1161 (Supp. 1976); Va. Code Ann. § 22–231.1 (1973); W. Va. Code, § 18A–5–1 (1977); Wyo. Stat. § 21.1–64 (Supp. 1975).

[24] Cal. Educ. Code § 49001 (West Supp. 1977) (requiring prior parental approval in writing); Fla. Stat. Ann. § 232.27 (3) (1977) (requiring a written explanation on request); Mont. Rev. Codes Ann. § 75–6109 (1971) (requiring prior parental notification).

[25] Md. Ann. Code, Art. 77, § 98B (1975).

[26] Fla. Stat. Ann. § 232.27 (1977); Haw. Rev. Stats. § 298–16 (1975 Supp.); Mont. Rev. Codes Ann. § 75–6109 (1971).

[27] Mass. Gen. Laws Ann., c. 71, § 37G (Supp. 1976); N. J. Stat. Ann. § 18A: 6–1 (1968).

[28] *E. g., Suits* v. *Glover*, 260 Ala. 449, 71 So. 2d 49 (1954); *La Frentz* v. *Gallagher*, 105 Ariz. 255, 462 P. 2d 804 (1969); *Berry* v. *Arnold School Dist.*, 199 Ark. 1118, 137 S. W. 2d 256 (1940); *Andreozzi* v. *Rubano*, 145 Conn. 280, 141 A. 2d 639 (1958); *Tinkham* v. *Kole*, 252 Iowa 1303, 110 N. W. 2d 258 (1961); *Carr* v. *Wright*, 423 S. W. 2d 521 (Ky. 1968); *Christman* v. *Hickman*, 225 Mo. App. 828, 37 S. W. 2d 672 (1931); *Simms* v. *School Dist. No. 1*, 13 Ore. App. 119, 508 P. 2d 236 (1973); *Marlar* v. *Bill*, 181 Tenn. 100, 178 S. W. 2d 634 (1944); *Prendergast* v. *Masterson*, 196 S. W. 246 (Tex. Civ. App. 1917). See generally sources cited n. 19, *supra*.

## III

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Bail, fines, and punishment traditionally have been associated with the criminal process, and by subjecting the three to parallel limitations the text of the Amendment suggests an intention to limit the power of those entrusted with the criminal-law function of government. An examination of the history of the Amendment and the decisions of this Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes. We adhere to this long-standing limitation and hold that the Eighth Amendment does not apply to the paddling of children as a means of maintaining discipline in public schools.

## A

The history of the Eighth Amendment is well known.[29] The text was taken, almost verbatim, from a provision of the Virginia Declaration of Rights of 1776, which in turn derived from the English Bill of Rights of 1689. The English version, adopted after the accession of William and Mary, was intended to curb the excesses of English judges under the reign of James II. Historians have viewed the English provision as a reaction either to the "Bloody Assize," the treason trials conducted by Chief Justice Jeffreys in 1685 after the abortive rebellion of the Duke of Monmouth,[30] or to the perjury prosecution of Titus Oates in the same year.[31] In

---

[29] See *Gregg* v. *Georgia*, 428 U. S. 153, 168–173 (1976) (joint opinion of STEWART, POWELL, and STEVENS, JJ.) (hereinafter joint opinion); *Furman* v. *Georgia*, 408 U. S. 238, 316–328 (1972) (MARSHALL, J., concurring); Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839 (1969).

[30] See I. Brant, The Bill of Rights 155 (1965).

[31] See Granucci, *supra*, at 852–860.

either case, the exclusive concern of the English version was the conduct of judges in enforcing the criminal law. The original draft introduced in the House of Commons provided: [32]

> "The requiring excessive bail of persons committed in criminal cases and imposing excessive fines, and illegal punishments, to be prevented."

Although the reference to "criminal cases" was eliminated from the final draft, the preservation of a similar reference in the preamble [33] indicates that the deletion was without substantive significance. Thus, Blackstone treated each of the provision's three prohibitions as bearing only on criminal proceedings and judgments.[34]

The Americans who adopted the language of this part of the English Bill of Rights in framing their own State and Federal Constitutions 100 years later feared the imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured. *Weems* v. *United States,* 217 U. S. 349, 371–373 (1910). Indeed, the principal concern of the American Framers appears to have been with the legislative definition of crimes and punishments. *In re Kemmler,* 136 U. S. 436, 446–447 (1890);

---

[32] *Id.,* at 855.

[33] The preamble reads in part:

"WHEREAS the late King James the Second, by the assistance of divers evil counsellors, judges, and ministers employed by him, did endeavor to subvert and extirpate . . . the laws and liberties of this kingdom.

. . . . . . . . .

"10. And excessive bail hath been required of persons committed in criminal cases, to elude the benefit of the laws made for the liberty of the subjects.

"11. And excessive fines have been imposed; and illegal and cruel punishments inflicted. . . ." R. Perry & J. Cooper, Sources of Our Liberties 245–246 (1959).

[34] 4 W. Blackstone, Commentaries *297 (bail), *379 (fines and other punishments).

*Furman* v. *Georgia,* 408 U. S. 238, 263 (1972) (BRENNAN, J., concurring). But if the American provision was intended to restrain government more broadly than its English model, the subject to which it was intended to apply—the criminal process—was the same.

At the time of its ratification, the original Constitution was criticized in the Massachusetts and Virginia Conventions for its failure to provide any protection for persons convicted of crimes.[35] This criticism provided the impetus for inclusion of the Eighth Amendment in the Bill of Rights. When the Eighth Amendment was debated in the First Congress, it was met by the objection that the Cruel and Unusual Punishments Clause might have the effect of outlawing what were then the common criminal punishments of hanging, whipping, and earcropping. 1 Annals of Cong. 754 (1789). The objection was not heeded, "precisely because the legislature would otherwise have had the unfettered power to prescribe punishments for crimes." *Furman* v. *Georgia, supra,* at 263.

## B

In light of this history, it is not surprising to find that every decision of this Court considering whether a punishment is "cruel and unusual" within the meaning of the Eighth and Fourteenth Amendments has dealt with a criminal punishment.

---

[35] Abraham Holmes of Massachusetts complained specifically of the absence of a provision restraining Congress in its power to determine "what kind of punishments shall be inflicted on persons convicted of crimes." 2 J. Elliot, Debates on the Federal Constitution 111 (1876). Patrick Henry was of the same mind:

"What says our [Virginia] bill of rights?—'that excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' Are you not, therefore, now calling on those gentlemen who are to compose Congress, to prescribe trials and define punishments without this control? Will they find sentiments there similar to this bill of rights? You let them loose; you do more—you depart from the genius of your country. . . ." 3 *id.,* at 447.

See *Estelle* v. *Gamble,* 429 U. S. 97 (1976) (incarceration without medical care); *Gregg* v. *Georgia,* 428 U. S. 153 (1976) (execution for murder); *Furman* v. *Georgia, supra* (execution for murder); *Powell* v. *Texas,* 392 U. S. 514 (1968) (plurality opinion) ($20 fine for public drunkenness); *Robinson* v. *California,* 370 U. S. 660 (1962) (incarceration as a criminal for addiction to narcotics); *Trop* v. *Dulles,* 356 U. S. 86 (1958) (plurality opinion) (expatriation for desertion); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947) (execution by electrocution after a failed first attempt); *Weems* v. *United States, supra* (15 years' imprisonment and other penalties for falsifying an official document); *Howard* v. *Fleming,* 191 U. S. 126 (1903) (10 years' imprisonment for conspiracy to defraud); *In re Kemmler, supra* (execution by electrocution); *Wilkerson* v. *Utah,* 99 U. S. 130 (1879) (execution by firing squad); *Pervear* v. *Commonwealth,* 5 Wall. 475 (1867) (fine and imprisonment at hard labor for bootlegging).

These decisions recognize that the Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes, *e. g., Estelle* v. *Gamble, supra; Trop* v. *Dulles, supra;* second, it proscribes punishment grossly disproportionate to the severity of the crime, *e. g., Weems* v. *United States, supra;* and third, it imposes substantive limits on what can be made criminal and punished as such, *e. g., Robinson* v. *California, supra.* We have recognized the last limitation as one to be applied sparingly. "The primary purpose of [the Cruel and Unusual Punishments Clause] has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes . . . ." *Powell* v. *Texas, supra,* at 531–532 (plurality opinion).

In the few cases where the Court has had occasion to confront claims that impositions outside the criminal process constituted cruel and unusual punishment, it has had no diffi-

culty finding the Eighth Amendment inapplicable. Thus, in *Fong Yue Ting* v. *United States,* 149 U. S. 698 (1893), the Court held the Eighth Amendment inapplicable to the deportation of aliens on the ground that "deportation is not a punishment for crime." *Id.,* at 730; see *Mahler* v. *Eby,* 264 U. S. 32 (1924); *Bugajewitz* v. *Adams,* 228 U. S. 585 (1913). And in *Uphaus* v. *Wyman,* 360 U. S. 72 (1959), the Court sustained a judgment of civil contempt, resulting in incarceration pending compliance with a subpoena, against a claim that the judgment imposed cruel and unusual punishment. It was emphasized that the case involved " 'essentially a civil remedy designed for the benefit of other parties . . . exercised for centuries to secure compliance with judicial decrees.' " *Id.,* at 81, quoting *Green* v. *United States,* 356 U. S. 165, 197 (1958) (dissenting opinion).[36]

## C

Petitioners acknowledge that the original design of the Cruel and Unusual Punishments Clause was to limit criminal punishments, but urge nonetheless that the prohibition should be extended to ban the paddling of schoolchildren. Observing that the Framers of the Eighth Amendment could not have envisioned our present system of public and compulsory education, with its opportunities for noncriminal punishments, petitioners contend that extension of the prohibition against cruel punishments is necessary lest we afford greater protec-

---

[36] In urging us to extend the Eighth Amendment to ban school paddlings, petitioners rely on the many decisions in which this Court has held that the prohibition against "cruel and unusual" punishments is not " 'fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.' " *Gregg* v. *Georgia,* 428 U. S., at 171 (joint opinion); see, *e. g.,* *Trop* v. *Dulles,* 356 U. S. 86, 100–101 (1958) (plurality opinion); *Weems* v. *United States,* 217 U. S. 349, 373, 378 (1910). This reliance is misplaced. Our Eighth Amendment decisions have referred to "evolving standards of decency," *Trop* v. *Dulles, supra,* at 101, only in determining whether criminal punishments are "cruel and unusual" under the Amendment.

tion to criminals than to schoolchildren. It would be anomalous, they say, if schoolchildren could be beaten without constitutional redress, while hardened criminals suffering the same beatings at the hands of their jailers might have a valid claim under the Eighth Amendment. See *Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968); cf. *Estelle* v. *Gamble, supra.* Whatever force this logic may have in other settings,[37] we find it an inadequate basis for wrenching the Eighth Amendment from its historical context and extending it to traditional disciplinary practices in the public schools.

The prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration. The prisoner's conviction entitles the State to classify him as a "criminal," and his incarceration deprives him of the freedom "to be with family and friends and to form the other enduring attachments of normal life." *Morrissey* v. *Brewer,* 408 U. S. 471, 482 (1972); see *Meachum* v. *Fano,* 427 U. S. 215, 224–225 (1976). Prison brutality, as the Court of Appeals observed in this case, is "part of the total punishment to which the individual is being subjected for his crime and, as such, is a proper subject for Eighth Amendment scrutiny." 525 F. 2d, at 915.[38] Even so, the protection af-

---

[37] Some punishments, though not labeled "criminal" by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment. Cf. *In re Gault,* 387 U. S. 1 (1967). We have no occasion in this case, for example, to consider whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the Eighth Amendment.

[38] Judge Friendly similarly has observed that the Cruel and Unusual Punishments Clause "can fairly be deemed to be applicable to the manner in which an otherwise constitutional sentence . . . is carried out by an executioner, see Louisiana ex rel. Francis v. Resweber, 329 U. S. 459 . . . (1947), or to cover conditions of confinement which may make intolerable an otherwise constitutional term of imprisonment." *Johnson* v. *Glick,* 481 F. 2d 1028, 1032 (CA2), cert. denied, 414 U. S. 1033 (1973) (citation omitted).

forded by the Eighth Amendment is limited. After incarceration, only the " 'unnecessary and wanton infliction of pain,' " *Estelle* v. *Gamble,* 429 U. S., at 103, quoting *Gregg* v. *Georgia,* 428 U. S., at 173, constitutes cruel and unusual punishment forbidden by the Eighth Amendment.

The schoolchild has little need for the protection of the Eighth Amendment. Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during school hours; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment.

The openness of the public school and its supervision by the community afford significant safeguards against the kinds of abuses from which the Eighth Amendment protects the prisoner. In virtually every community where corporal punishment is permitted in the schools, these safeguards are reinforced by the legal constraints of the common law. Public school teachers and administrators are privileged at common law to inflict only such corporal punishment as is reasonably necessary for the proper education and discipline of the child; any punishment going beyond the privilege may result in both civil and criminal liability. See Part II, *supra.* As long as the schools are open to public scrutiny, there is no reason to believe that the common-law constraints will not effectively remedy and deter excesses such as those alleged in this case.[39]

---

[39] Putting history aside as irrelevant, the dissenting opinion of MR. JUSTICE WHITE argues that a "purposive analysis" should control the reach of the Eighth Amendment. *Post,* at 686–688. There is no support whatever for this approach in the decisions of this Court. Although an imposition must be "punishment" for the Cruel and Unusual Punishments Clause to apply, the Court has never held that *all* punishments are subject to Eighth Amendment scrutiny. See n. 40, *infra.* The ap-

We conclude that when public school teachers or administrators impose disciplinary corporal punishment, the Eighth Amendment is inapplicable. The pertinent constitutional question is whether the imposition is consonant with the requirements of due process.[40]

plicability of the Eighth Amendment always has turned on its original meaning, as demonstrated by its historical derivation. See *Gregg* v. *Georgia,* 428 U. S., at 169–173 (joint opinion); *Furman* v. *Georgia,* 408 U. S., at 315–328 (MARSHALL, J., concurring).

The dissenting opinion warns that as a consequence of our decision today, teachers may "cut off a child's ear for being late to class." *Post,* at 684. This rhetoric bears no relation to reality or to the issues presented in this case. The laws of virtually every State forbid the excessive physical punishment of schoolchildren. Yet the logic of the dissent would make the judgment of which disciplinary punishments are reasonable and which are excessive a matter of constitutional principle in every case, to be decided ultimately by this Court. The hazards of such a broad reading of the Eighth Amendment are clear. "It is always time to say that this Nation is too large, too complex and composed of too great a diversity of peoples for any one of us to have the wisdom to establish the rules by which local Americans must govern their local affairs. The constitutional rule we are urged to adopt is not merely revolutionary—it departs from the ancient faith based on the premise that experience in making local laws by local people themselves is by far the safest guide for a nation like ours to follow." *Powell* v. *Texas,* 392 U. S. 514, 547–548 (1968) (opinion of Black, J.).

[40] Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. See *United States* v. *Lovett,* 328 U. S. 303, 317–318 (1946). Thus, in *Trop* v. *Dulles,* 356 U. S. 86 (1958), the plurality appropriately took the view that denationalization was an impermissible punishment for wartime desertion under the Eighth Amendment, because desertion already had been established at a criminal trial. But in *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144 (1963), where the Court considered denationalization as a punishment for evading the draft, the Court refused to reach the Eighth Amendment issue, holding instead that the punishment could be imposed only through the criminal process. *Id.,* at 162–167, 186, and n. 43. As these cases demonstrate, the State does not acquire the power to punish with which the Eighth Amendment is concerned until after

## IV

The Fourteenth Amendment prohibits any state deprivation of life, liberty, or property without due process of law. Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of "life, liberty or property"; if protected interests are implicated, we then must decide what procedures constitute "due process of law." *Morrissey* v. *Brewer,* 408 U. S., at 481; *Board of Regents* v. *Roth,* 408 U. S. 564, 569–572 (1972). See Friendly, Some Kind of Hearing, 123 U. Pa. L. Rev. 1267 (1975). Following that analysis here, we find that corporal punishment in public schools implicates a constitutionally protected liberty interest, but we hold that the traditional common-law remedies are fully adequate to afford due process.

### A

"[T]he range of interests protected by procedural due process is not infinite." *Board of Regents* v. *Roth, supra,* at 570. We have repeatedly rejected "the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Meachum* v. *Fano,* 427 U. S., at 224. Due process is required only when a decision of the State implicates an interest within the protection of the Fourteenth Amendment. And "to determine whether due process requirements apply in. the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." *Roth, supra,* at 570–571.

The Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth, was intended to give Ameri-

---

it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

cans at least the protection against governmental power that they had enjoyed as Englishmen against the power of the Crown. The liberty preserved from deprivation without due process included the right "generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923); see *Dent* v. *West Virginia,* 129 U. S. 114, 123–124 (1889). Among the historic liberties so protected was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.[41]

While the contours of this historic liberty interest in the context of our federal system of government have not been defined precisely,[42] they always have been thought to encom-

---

[41] See 1 W. Blackstone, Commentaries *134. Under the 39th Article of the Magna Carta, an individual could not be deprived of this right of personal security "except by the legal judgment of his peers or by the law of the land." Perry & Cooper, *supra,* n. 33, at 17. By subsequent enactments of Parliament during the time of Edward III, the right was protected from deprivation except "by due process of law." See Shattuck, The True Meaning of the Term "Liberty," 4 Harv. L. Rev. 365, 372–373 (1891).

[42] See, *e. g., Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942) (sterilization); *Jacobson* v. *Massachusetts,* 197 U. S. 11 (1905) (vaccination); *Union Pacific R. Co.* v. *Botsford,* 141 U. S. 250, 251–252 (1891) (physical examinations); cf. *ICC* v. *Brimson,* 154 U. S. 447, 479 (1894).

The right of personal security is also protected by the Fourth Amendment, which was made applicable to the States through the Fourteenth because its protection was viewed as "implicit in 'the concept of ordered liberty' . . . enshrined in the history and the basic constitutional documents of English-speaking peoples." *Wolf* v. *Colorado,* 338 U. S. 25, 27–28 (1949). It has been said of the Fourth Amendment that its "overriding function . . . is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber* v. *California,* 384 U. S. 757, 767 (1966). But the principal concern of that Amendment's prohibition against unreasonable searches and seizures is with intrusions on privacy in the course of criminal investigations. See *Whalen* v. *Roe,* 429 U. S. 589, 604 n. 32 (1977). Petitioners do not contend that the Fourth Amendment applies, according to its terms, to corporal punishment in public school.

pass freedom from bodily restraint and punishment. See *Rochin* v. *California*, 342 U. S. 165 (1952). It is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law.

This constitutionally protected liberty interest is at stake in this case. There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned. But at least where school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated.[43]

## B

"[T]he question remains what process is due." *Morrissey* v. *Brewer, supra,* at 481. Were it not for the common-law privilege permitting teachers to inflict reasonable corporal punishment on children in their care, and the availability of the traditional remedies for abuse, the case for requiring advance procedural safeguards would be strong indeed.[44] But here we deal with a punishment—paddling—within that tra-

---

[43] Unlike *Goss* v. *Lopez,* 419 U. S. 565 (1975), this case does not involve the state-created property interest in public education. The purpose of corporal punishment is to correct a child's behavior without interrupting his education. That corporal punishment may, in a rare case, have the unintended effect of temporarily removing a child from school affords no basis for concluding that the practice itself deprives students of property protected by the Fourteenth Amendment.

Nor does this case involve any state-created interest in liberty going beyond the Fourteenth Amendment's protection of freedom from bodily restraint and corporal punishment. Cf. *Meachum* v. *Fano,* 427 U. S. 215, 225–227 (1976).

[44] If the common-law privilege to inflict reasonable corporal punishment in school were inapplicable, it is doubtful whether any procedure short of a trial in a criminal or juvenile court could satisfy the requirements of procedural due process for the imposition of such punishment. See *United States* v. *Lovett,* 328 U. S., at 317–318; cf. *Breed* v. *Jones,* 421 U. S. 519, 528–529 (1975).

dition, and the question is whether the common-law remedies are adequate to afford due process.

"'[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . Representing a profound attitude of fairness . . . 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. . . ." *Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123, 162–163 (1951) (Frankfurter, J., concurring).

Whether in this case the common-law remedies for excessive corporal punishment constitute due process of law must turn on an analysis of the competing interests at stake, viewed against the background of "history, reason, [and] the past course of decisions." The analysis requires consideration of three distinct factors: "First, the private interest that will be affected . . . ; second, the risk of an erroneous deprivation of such interest . . . and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [state] interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976). Cf. *Arnett* v. *Kennedy,* 416 U. S. 134, 167–168 (1974) (POWELL, J., concurring).

1

Because it is rooted in history, the child's liberty interest in avoiding corporal punishment while in the care of public school authorities is subject to historical limitations. Under the common law, an invasion of personal security gave rise to a right to recover damages in a subsequent judicial proceeding. 3 W. Blackstone, Commentaries *120–121. But the right of recovery was qualified by the concept of justification. Thus, there could be no recovery against a teacher who gave only "moderate correction" to a child. *Id.,* at *120. To the

extent that the force used was reasonable in light of its purpose, it was not wrongful, but rather "justifiable or lawful." *Ibid.*

The concept that reasonable corporal punishment in school is justifiable continues to be recognized in the laws of most States. See Part II, *supra.* It represents "the balance struck by this country," *Poe* v. *Ullman,* 367 U. S. 497, 542 (1961) (Harlan, J., dissenting), between the child's interest in personal security and the traditional view that some limited corporal punishment may be necessary in the course of a child's education. Under that longstanding accommodation of interests, there can be no deprivation of substantive rights as long as disciplinary corporal punishment is within the limits of the common-law privilege.

This is not to say that the child's interest in procedural safeguards is insubstantial. The school disciplinary process is not "a totally accurate, unerring process, never mistaken and never unfair. . . ." *Goss* v. *Lopez,* 419 U. S. 565, 579–580 (1975). In any deliberate infliction of corporal punishment on a child who is restrained for that purpose, there is some risk that the intrusion on the child's liberty will be unjustified and therefore unlawful. In these circumstances the child has a strong interest in procedural safeguards that minimize the risk of wrongful punishment and provide for the resolution of disputed questions of justification.

We turn now to a consideration of the safeguards that are available under applicable Florida law.

2

Florida has continued to recognize, and indeed has strengthened by statute, the common-law right of a child not to be subjected to excessive corporal punishment in school. Under Florida law the teacher and principal of the school decide in the first instance whether corporal punishment is reasonably necessary under the circumstances in order to discipline

a child who has misbehaved. But they must exercise prudence and restraint. For Florida has preserved the traditional judicial proceedings for determining whether the punishment was justified. If the punishment inflicted is later found to have been excessive—not reasonably believed at the time to be necessary for the child's discipline or training—the school authorities inflicting it may be held liable in damages to the child and, if malice is shown, they may be subject to criminal penalties.[45]

Although students have testified in this case to specific instances of abuse, there is every reason to believe that such mistreatment is an aberration. The uncontradicted evidence suggests that corporal punishment in the Dade County schools was, "[w]ith the exception of a few cases, . . . unremarkable in physical severity." App. 147. Moreover, because paddlings are usually inflicted in response to conduct directly

---

[45] See *supra*, at 655–657, 661. The statutory prohibition against "degrading" or unnecessarily "severe" corporal punishment in former § 232.27 has been construed as a statement of the common-law principle. See 1937 Op. Fla. Atty. Gen., Biennial Report of the Atty. Gen. 169 (1937–1938); cf. 1957 Op. Fla. Atty. Gen., Biennial Report of the Atty. Gen. 7, 8 (1957–1958). Florida Stat. Ann. § 827.03 (3) (1976) makes malicious punishment of a child a felony. Both the District Court, App. 144, and the Court of Appeals, 525 F. 2d, at 915, expressed the view that the common-law tort remedy was available to the petitioners in this case. And petitioners conceded in this Court that a teacher who inflicts excessive punishment on a child may be held both civilly and criminally liable under Florida law. Brief for Petitioners 33 n. 11, 34; Tr. of Oral Arg. 17, 52–53.

In view of the statutory adoption of the common-law rule, and the unanimity of the parties and the courts below, the doubts expressed in MR. JUSTICE WHITE's dissenting opinion as to the availability of tort remedies in Florida can only be viewed as chimerical. The dissent makes much of the fact that no Florida court has ever "recognized" a damages remedy for unreasonable corporal punishment. *Post,* at 694 n. 11, 700. But the absence of reported Florida decisions hardly suggests that no remedy is available. Rather, it merely confirms the commonsense judgment that excessive corporal punishment is exceedingly rare in the public schools.

observed by teachers in their presence, the risk that a child will be paddled without cause is typically insignificant. In the ordinary case, a disciplinary paddling neither threatens seriously to violate any substantive rights nor condemns the child "to suffer grievous loss of any kind." *Anti-Fascist Comm.* v. *McGrath,* 341 U. S., at 168 (Frankfurter, J., concurring).

In those cases where severe punishment is contemplated, the available civil and criminal sanctions for abuse—considered in light of the openness of the school environment—afford significant protection against unjustified corporal punishment. See *supra,* at 670. Teachers and school authorities are unlikely to inflict corporal punishment unnecessarily or excessively when a possible consequence of doing so is the institution of civil or criminal proceedings against them.[46]

It still may be argued, of course, that the child's liberty interest would be better protected if the common-law remedies were supplemented by the administrative safeguards of prior notice and a hearing. We have found frequently that some kind of prior hearing is necessary to guard against arbitrary impositions on interests protected by the Fourteenth Amend-

---

[46] The low incidence of abuse, and the availability of established judicial remedies in the event of abuse, distinguish this case from *Goss* v. *Lopez,* 419 U. S. 565 (1975). The Ohio law struck down in *Goss* provided for suspensions from public school of up to 10 days without "any written procedure applicable to suspensions." *Id.,* at 567. Although Ohio law provided generally for administrative review, Ohio Rev. Code Ann. § 2506.01 (Supp. 1973), the Court assumed that the short suspensions would not be stayed pending review, with the result that the review proceeding could serve neither a deterrent nor a remedial function. 419 U. S., at 581 n. 10. In these circumstances, the Court held the law authorizing suspensions unconstitutional for failure to require "that there be at least an informal give-and-take between student and disciplinarian, preferably prior to the suspension . . . ." *Id.,* at 584. The subsequent civil and criminal proceedings available in this case may be viewed as affording substantially greater protection to the child than the informal conference mandated by *Goss.*

ment.   See, *e. g., Board of Regents* v. *Roth*, 408 U. S., at 569–570; *Wolff* v. *McDonnell*, 418 U. S. 539, 557–558 (1974); cf. Friendly, 123 U. Pa. L. Rev., at 1275–1277.   But where the State has preserved what "has always been the law of the land," *United States* v. *Barnett*, 376 U. S. 681 (1964), the case for administrative safeguards is significantly less compelling.[47]

There is a relevant analogy in the criminal law.   Although the Fourth Amendment specifically proscribes "seizure" of a person without probable cause, the risk that police will act unreasonably in arresting a suspect is not thought to require an advance determination of the facts.   In *United States* v. *Watson*, 423 U. S. 411 (1976), we reaffirmed the traditional common-law rule that police officers may make warrantless public arrests on probable cause.   Although we observed that an advance determination of probable cause by a magistrate would be desirable, we declined "to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause . . . ." *Id.*, at 423; see *id.*, at 429 (POWELL, J., concurring).   Despite the distinct possibility that a police officer may improperly assess the facts and thus unconstitutionally deprive an individual of

---

[47] "[P]rior hearings might well be dispensed with in many circumstances in which the state's conduct, if not adequately justified, would constitute a common-law tort.   This would leave the injured plaintiff in precisely the same posture as a common-law plaintiff, and this procedural consequence would be quite harmonious with the substantive view that the fourteenth amendment encompasses the same liberties as those protected by the common law."   Monaghan, Of "Liberty" and "Property," 62 Cornell L. Rev. 405, 431 (1977) (footnote omitted).   See *Bonner* v. *Coughlin*, 517 F. 2d 1311, 1319 (CA7 1975), modified en banc, 545 F. 2d 565 (1976), cert. pending, No. 76–6204.

We have no occasion in this case, see *supra*, at 659, and n. 12, to decide whether or under what circumstances corporal punishment of a public school child may give rise to an independent federal cause of action to vindicate substantive rights under the Due Process Clause.

liberty, we declined to depart from the traditional rule by which the officer's perception is subjected to judicial scrutiny only after the fact.[48] There is no more reason to depart from tradition and require advance procedural safeguards for intrusions on personal security to which the Fourth Amendment does not apply.

### 3

But even if the need for advance procedural safeguards were clear, the question would remain whether the incremental benefit could justify the cost. Acceptance of petitioners' claims would work a transformation in the law governing corporal punishment in Florida and most other States. Given the impracticability of formulating a rule of procedural due process that varies with the severity of the particular imposition,[49] the prior hearing petitioners seek would have to precede *any* paddling, however moderate or trivial.

Such a universal constitutional requirement would significantly burden the use of corporal punishment as a disciplinary measure. Hearings—even informal hearings—require time, personnel, and a diversion of attention from normal school pursuits. School authorities may well choose to abandon corporal punishment rather than incur the burdens of complying with the procedural requirements. Teachers, properly concerned with maintaining authority in the classroom, may well prefer to rely on other disciplinary measures—which they may view as less effective—rather than confront the

---

[48] See also *Terry* v. *Ohio,* 392 U. S. 1 (1968). The reasonableness of a warrantless public arrest may be subjected to subsequent judicial scrutiny in a civil action against the law enforcement officer or in a suppression hearing to determine whether any evidence seized in the arrest may be used in a criminal trial.

[49] "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions. . . ." *Mathews* v. *Eldridge,* 424 U. S. 319, 344 (1976).

possible disruption that prior notice and a hearing may entail.[50] Paradoxically, such an alteration of disciplinary policy is most likely to occur in the ordinary case where the contemplated punishment is well within the common-law privilege.[51]

Elimination or curtailment of corporal punishment would be welcomed by many as a societal advance. But when such a policy choice may result from this Court's determination of an asserted right to due process, rather than from the normal processes of community debate and legislative action, the societal costs cannot be dismissed as insubstantial.[52] We are reviewing here a legislative judgment, rooted in history and reaffirmed in the laws of many States, that corporal punishment serves important educational interests. This judgment must be viewed in light of the disciplinary problems commonplace in the schools. As noted in *Goss* v. *Lopez,* 419 U. S., at 580: "Events calling for discipline are frequent occurrences and sometimes require immediate, effective action." [53] As-

---

[50] If a prior hearing, with the inevitable attendant publicity within the school, resulted in rejection of the teacher's recommendation, the consequent impairment of the teacher's ability to maintain discipline in the classroom would not be insubstantial.

[51] The effect of interposing prior procedural safeguards may well be to make the punishment more severe by increasing the anxiety of the child. For this reason, the school authorities in Dade County found it desirable that the punishment be inflicted as soon as possible after the infraction. App. 48–49.

[52] "It may be true that procedural regularity in disciplinary proceedings promotes a sense of institutional rapport and open communication, a perception of fair treatment, and provides the offender and his fellow students a showcase of democracy at work. But . . . [r]espect for democratic institutions will equally dissipate if they are thought too ineffectual to provide their students an environment of order in which the educational process may go forward. . . ." Wilkinson, Goss v. Lopez: The Supreme Court as School Superintendent, 1975 Sup. Ct. Rev. 25, 71–72.

[53] The seriousness of the disciplinary problems in the Nation's public schools has been documented in a recent congressional report, Senate Committee on the Judiciary, Subcommittee to Investigate Juvenile Delin-

sessment of the need for, and the appropriate means of
maintaining, school discipline is committed generally to the
discretion of school authorities subject to state law. "[T]he
Court has repeatedly emphasized the need for affirming the
comprehensive authority of the States and of school officials,
consistent with fundamental constitutional safeguards, to
prescribe and control conduct in the schools." *Tinker* v. *Des
Moines School Dist.*, 393 U. S. 503, 507 (1969).[54]

"At some point the benefit of an additional safeguard to
the individual affected . . . and to society in terms of increased
assurance that the action is just, may be outweighed by
the cost." *Mathews* v. *Eldridge,* 424 U. S., at 348. We
think that point has been reached in this case. In view
of the low incidence of abuse, the openness of our schools, and
the common-law safeguards that already exist, the risk of error
that may result in violation of a schoolchild's substantive
rights can only be regarded as minimal. Imposing additional
administrative safeguards as a constitutional requirement
might reduce that risk marginally, but would also entail a
significant intrusion into an area of primary educational re-
sponsibility. We conclude that the Due Process Clause does
not require notice and a hearing prior to the imposition of cor-
poral punishment in the public schools, as that practice is
authorized and limited by the common law.[55]

----

quency, Challenge for the Third Century: Education in a Safe Environ-
ment—Final Report on the Nature and Prevention of School Violence and
Vandalism, 95th Cong., 1st Sess. (Comm. Print 1977).

[54] The need to maintain order in a trial courtroom raises similar prob-
lems. In that context, this Court has recognized the power of the trial
judge "to punish summarily and without notice or hearing contemptuous
conduct committed in his presence and observed by him." *Taylor* v.
*Hayes,* 418 U. S. 488, 497 (1974), citing *Ex parte Terry,* 128 U. S. 289
(1888). The punishment so imposed may be as severe as six months in
prison. See *Codispoti* v. *Pennsylvania,* 418 U. S. 506, 513–515 (1974);
cf. *Muniz* v. *Hoffman,* 422 U. S. 454, 475–476 (1975).

[55] Mr. Justice White's dissenting opinion offers no manageable stand-
ards for determining what process is due in any particular case. The

## V

Petitioners cannot prevail on either of the theories before us in this case. The Eighth Amendment's prohibition against cruel and unusual punishment is inapplicable to school paddlings, and the Fourteenth Amendment's requirement of procedural due process is satisfied by Florida's preservation of common-law constraints and remedies. We therefore agree with the Court of Appeals that petitioners' evidence affords no basis for injunctive relief, and that petitioners cannot recover damages on the basis of any Eighth Amendment or procedural due process violation.

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

Today the Court holds that corporal punishment in public schools, no matter how severe, can never be the subject of the protections afforded by the Eighth Amendment. It also holds

---

dissent apparently would require, as a general rule, only "an informal give-and-take between student and disciplinarian." *Post,* at 693. But the dissent would depart from these "minimal procedures"—requiring even witnesses, counsel, and cross-examination—in cases where the punishment reaches some undefined level of severity. *Post,* at 700 n. 18. School authorities are left to guess at the degree of punishment that will require more than an "informal give-and-take" and at the additional process that may be constitutionally required. The impracticality of such an approach is self-evident, and illustrates the hazards of ignoring the traditional solution of the common law.

We agree with the dissent that the *Goss* procedures will often be, "if anything, less than a fair-minded school principal would impose upon himself." *Post,* at 700, quoting *Goss,* 419 U. S., at 583. But before this Court invokes the Constitution to impose a procedural requirement, it should be reasonably certain that the effect will be to afford protection appropriate to the constitutional interests at stake. The dissenting opinion's reading of the Constitution suggests no such beneficial result and, indeed, invites a lowering of existing constitutional standards.

that students in the public school systems are not constitutionally entitled to a hearing of any sort before beatings can be inflicted on them. Because I believe that these holdings are inconsistent with the prior decisions of this Court and are contrary to a reasoned analysis of the constitutional provisions involved, I respectfully dissent.

## I

## A

The Eighth Amendment places a flat prohibition against the infliction of "cruel and unusual punishments." This reflects a societal judgment that there are some punishments that are so barbaric and inhumane that we will not permit them to be imposed on anyone, no matter how opprobrious the offense. See *Robinson* v. *California,* 370 U. S. 660, 676 (1962) (Douglas, J., concurring). If there are some punishments that are so barbaric that they may not be imposed for the commission of crimes, designated by our social system as the most thoroughly reprehensible acts an individual can commit, then, *a fortiori,* similar punishments may not be imposed on persons for less culpable acts, such as breaches of school discipline. Thus, if it is constitutionally impermissible to cut off someone's ear for the commission of murder, it must be unconstitutional to cut off a child's ear for being late to class.[1] Although there were no ears cut off in this case, the

---

[1] There is little reason to fear that if the Eighth Amendment is held to apply *at all* to corporal punishment of schoolchildren, *all* paddlings, however moderate, would be prohibited. *Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968), held that *any* paddling or flogging of prisoners, convicted of crime and serving prison terms, violated the cruel and unusual punishment ban of the Eighth Amendment. But aside from the fact that *Bishop* has never been embraced by this Court, the theory of that case was not that bodily punishments are intrinsically barbaric or excessively severe but that paddling of prisoners is "degrading to the punisher and to the punished alike." *Id.,* at 580. That approach may be acceptable in the criminal justice system, but it has little if any relevance to corporal

record reveals beatings so severe that if they were inflicted on a hardened criminal for the commission of a serious crime, they might not pass constitutional muster.

Nevertheless, the majority holds that the Eighth Amendment "was designed to protect [only] those convicted of crimes," *ante,* at 664, relying on a vague and inconclusive recitation of the history of the Amendment. Yet the constitutional prohibition is against cruel and unusual *punishments;* nowhere is that prohibition limited or modified by the language of the Constitution. Certainly, the fact that the Framers did not choose to insert the word "criminal" into the language of the Eighth Amendment is strong evidence that the Amendment was designed to prohibit all inhumane or barbaric punishments, no matter what the nature of the offense for which the punishment is imposed.

No one can deny that spanking of schoolchildren is "punishment" under any reasonable reading of the word, for the similarities between spanking in public schools and other forms of punishment are too obvious to ignore. Like other forms of punishment, spanking of schoolchildren involves an institutionalized response to the violation of some official rule or regulation proscribing certain conduct and is imposed

---

punishment in the schools, for it can hardly be said that the use of moderate paddlings in the discipline of children is inconsistent with the country's evolving standards of decency.

On the other hand, when punishment involves a cruel, severe beating or chopping off an ear, something more than merely the dignity of the individual is involved. Whenever a given criminal punishment is "cruel and unusual" because it is inhumane or barbaric, I can think of no reason why it would be any less inhumane or barbaric when inflicted on a schoolchild, as punishment for classroom misconduct.

The issue in this case is whether spankings inflicted on public school children for breaking school rules is "punishment," not whether such punishment is "cruel and unusual." If the Eighth Amendment does not bar moderate spanking in public schools, it is because moderate spanking is not "cruel and unusual," not because it is not "punishment" as the majority suggests.

for the purpose of rehabilitating the offender, deterring the offender and others like him from committing the violation in the future, and inflicting some measure of social retribution for the harm that has been done.

## B

We are fortunate that in our society punishments that are severe enough to raise a doubt as to their constitutional validity are ordinarily not imposed without first affording the accused the full panoply of procedural safeguards provided by the criminal process.[2]  The effect has been that "every decision of this Court considering whether a punishment is 'cruel and unusual' within the meaning of the Eighth and Fourteenth Amendments has dealt with a criminal punishment." *Ante,* at 666.  The Court would have us believe from this fact that there is a recognized distinction between criminal and noncriminal punishment for purposes of the Eighth Amendment.  This is plainly wrong.  "[E]ven a clear legislative classification of a statute as 'non-penal' would not alter the fundamental nature of a plainly penal statute." *Trop* v. *Dulles,* 356 U. S. 86, 95 (1958) (plurality opinion).  The relevant inquiry is not whether the offense for which a punishment is inflicted has been labeled as criminal, but whether the purpose of the deprivation is among those ordinarily associated

---

[2] By no means is it suggested that just because spanking of schoolchildren is "punishment" within the meaning of the Cruel and Unusual Punishments Clause, the school disciplinary process is in any way "criminal" and therefore subject to the full panoply of criminal procedural guarantees. See Part II, *infra.*  Ordinarily, the conduct for which schoolchildren are punished is not sufficiently opprobrious to be called "criminal" in our society, and even violations of school disciplinary rules that might also constitute a crime, see *infra,* at 688, are not subject to the criminal process. See *Baxter* v. *Palmigiano,* 425 U. S. 308 (1976), where the Court held that persons who violate prison disciplinary rules are not entitled to the full panoply of criminal procedural safeguards, even if the rule violation might also constitute a crime.

with punishment, such as retribution, rehabilitation, or deterrence.[3]  *Id.*, at 96.  Cf. *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144 (1963).

If this purposive approach were followed in the present case, it would be clear that spanking in the Florida public schools is punishment within the meaning of the Eighth Amendment.  The District Court found that "[c]orporal punishment is one of a variety of measures employed in the school system for the correction of pupil behavior and the preservation of order."  App. 146.  Behavior correction and

---

[3] The majority cites *Trop* as one of the cases that "dealt with a criminal punishment" but neglects to follow the analysis mandated by that decision. In *Trop* the petitioner was convicted of desertion by a military court-martial and sentenced to three years at hard labor, forfeiture of all pay and allowances, and a dishonorable discharge.  After he was punished for the offense he committed, petitioner's application for a passport was turned down.  Petitioner was told that he had been deprived of the "rights of citizenship" under § 401 (g) of the Nationality Act of 1940 because he had been dishonorably discharged from the Armed Forces.  The plurality took the view that denationalization in this context was cruel and unusual punishment prohibited by the Eighth Amendment.

The majority would have us believe that the determinative factor in *Trop* was that the petitioner had been convicted of desertion; yet there is no suggestion in *Trop* that the disposition of the military court-martial had anything to do with the decision in that case.  Instead, while recognizing that the Eighth Amendment extends only to punishments that are penal in nature, the plurality adopted a purposive approach for determining when punishment is penal.

"In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute.  If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal.  But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose."  356 U. S., at 96 (footnotes omitted).

Although the quoted passage is taken from the plurality opinion of Mr. Chief Justice Warren, joined by three other Justices, MR. JUSTICE BRENNAN, in a concurring opinion, adopted a similar approach in concluding that § 401 (g) was beyond the power of Congress to enact.

preservation of order are purposes ordinarily associated with punishment.

Without even mentioning the purposive analysis applied in the prior decisions of this Court, the majority adopts a rule that turns on the label given to the offense for which the punishment is inflicted. Thus, the record in this case reveals that one student at Drew Junior High School received 50 licks with a paddle for allegedly making an obscene telephone call. Brief for Petitioners 13. The majority holds that the Eighth Amendment does not prohibit such punishment since it was only inflicted for a breach of school discipline. However, that same conduct is punishable as a misdemeanor under Florida law, Fla. Stat. Ann. § 365.16 (Supp. 1977), and there can be little doubt that if that same "punishment" had been inflicted by an officer of the state courts for violation of § 365.16, it would have had to satisfy the requirements of the Eighth Amendment.

## C

In fact, as the Court recognizes, the Eighth Amendment has never been confined to criminal punishments.[4] Nevertheless, the majority adheres to its view that any protections afforded by the Eighth Amendment must have something to do with

---

[4] *Ante,* at 669. In *Estelle* v. *Gamble,* 429 U. S. 97 (1976), a case decided this Term, the Court held that "deliberate indifference to the medical needs of prisoners" by prison officials constitutes cruel and unusual punishment prohibited by the Eighth Amendment. Such deliberate indifference to a prisoner's medical needs clearly is not punishment inflicted for the commission of a crime; it is merely misconduct by a prison official. Similarly, the Eighth Circuit has held that whipping a prisoner with a strap in order to maintain discipline is prohibited by the Eighth Amendment. *Jackson* v. *Bishop,* 404 F. 2d 571 (1968) (Blackmun, J.). See also *Knecht* v. *Gillman,* 488 F. 2d 1136, 1139–1140 (CA8 1973) (injection of vomit-inducing drugs as part of aversion therapy held to be cruel and unusual); *Vann* v. *Scott,* 467 F. 2d 1235, 1240–1241 (CA7 1972) (Stevens, J.) (Eighth Amendment protects runaway children against cruel and inhumane treatment, regardless of whether such treatment is labeled "rehabilitation" or "punishment").

criminals, and it would therefore confine any exceptions to its general rule that only criminal punishments are covered by the Eighth Amendment to abuses inflicted on prisoners. Thus, if a prisoner is beaten mercilessly for a breach of discipline, he is entitled to the protection of the Eighth Amendment, while a schoolchild who commits the same breach of discipline and is similarly beaten is simply not covered.

The purported explanation of this anomaly is the assertion that schoolchildren have no need for the Eighth Amendment. We are told that schools are open institutions, subject to constant public scrutiny; that schoolchildren have adequate remedies under state law;[5] and that prisoners suffer the social stigma of being labeled as criminals. How any of these policy considerations got into the Constitution is difficult to discern, for the Court has never considered any of these factors in determining the scope of the Eighth Amendment.[6]

---

[5] By finding that bodily punishment invades a constitutionally protected liberty interest within the meaning of the Due Process Clause, the majority suggests that the Clause might also afford a remedy for excessive spanking independently of the Eighth Amendment. If this were the case, the Court's present thesis would have little practical significance. If rather than holding that the Due Process Clause affords a remedy by way of the express commands of the Eighth Amendment, the majority would recognize a cause of action under 42 U. S. C. § 1983 for a deprivation of "liberty" flowing from an excessive paddling, the Court's opinion is merely a lengthy word of advice with respect to the drafting of civil complaints.

Petitioners in this case did raise the substantive due process issue in their petition for certiorari, *ante*, at 659 n. 12, but consideration of that question was foreclosed by our limited grant of certiorari. If it is probable that schoolchildren would be entitled to protection under some theory of substantive due process, the Court should not now affirm the judgment below, but should amend the grant of certiorari and set this case for reargument.

[6] In support of its policy considerations, the only cases from this Court cited by the majority are *Morrissey* v. *Brewer*, 408 U. S. 471 (1972), and *Meachum* v. *Fano*, 427 U. S. 215 (1976), both cases involving prisoners' rights to procedural due process.

The essence of the majority's argument is that schoolchildren do not need Eighth Amendment protection because corporal punishment is less subject to abuse in the public schools than it is in the prison system.[7] However, it cannot be reasonably suggested that just because cruel and unusual punishments may occur less frequently under public scrutiny, they will not occur at all. The mere fact that a public flogging or a public execution would be available for all to see would not render the punishment constitutional if it were otherwise impermissible. Similarly, the majority would not suggest that a prisoner who is placed in a minimum-security prison and permitted to go home to his family on the weekends should be any less entitled to Eighth Amendment protections than his counterpart in a maximum-security prison. In short, if a punishment is so barbaric and inhumane that it goes beyond the tolerance of a civilized society, its openness to public scrutiny should have nothing to do with its constitutional validity.

Nor is it an adequate answer that schoolchildren may have other state and constitutional remedies available to them. Even assuming that the remedies available to public school students are adequate under Florida law,[8] the availability of state remedies has never been determinative of the coverage or of the protections afforded by the Eighth Amendment. The reason is obvious. The fact that a person may have a

---

[7] There is no evidence in the record that corporal punishment has been abused in the prison systems more often than ·in the public schools. Indeed, corporal punishment is seldom authorized in state prisons. See *Jackson* v. *Bishop, supra,* at 580, where MR. JUSTICE (then Judge) BLACKMUN noted: "[O]nly two states still permit the use of the strap [in prisons]. Thus almost uniformly has it been abolished." By relying on its own view of the nature of these two·public institutions, without any evidence being heard on the question below, the majority today predicates a constitutional principle on mere armchair speculation.

[8] There is some doubt that the state-law remedies available to public school children are adequate. See n. 11, *infra.*

state-law cause of action against a public official who tortures him with a thumbscrew for the commission of an antisocial act has nothing to do with the fact that such official conduct is cruel and unusual punishment prohibited by the Eighth Amendment. Indeed, the majority's view was implicitly rejected this Term in *Estelle* v. *Gamble,* 429 U. S. 97 (1976), when the Court held that failure to provide for the medical needs of prisoners could constitute cruel and unusual punishment even though a medical malpractice remedy in tort was available to prisoners under state law. *Id.,* at 107 n. 15.

## D

By holding that the Eighth Amendment protects only criminals, the majority adopts the view that one is entitled to the protections afforded by the Eighth Amendment only if he is punished for acts that are sufficiently opprobrious for society to make them "criminal." This is a curious holding in view of the fact that the more culpable the offender the more likely it is that the punishment will not be disproportionate to the offense, and consequently, the less likely it is that the punishment will be cruel and unusual.[9] Conversely, a public school student who is spanked for a mere breach of discipline may sometimes have a strong argument that the punishment does not fit the offense, depending upon the severity of the beating, and therefore that it is cruel and unusual. Yet the majority would afford the student no protection no matter how inhumane and barbaric the punishment inflicted on him might be.

The issue presented in this phase of the case is limited to whether corporal punishment in public schools can *ever* be prohibited by the Eighth Amendment. I am therefore not

---

[9] For a penalty to be consistent with the Eighth Amendment "the punishment must not be grossly out of proportion to the severity of the crime." *Gregg* v. *Georgia,* 428 U. S. 153, 173 (1976) (joint opinion of STEWART, POWELL, and STEVENS, JJ.).

suggesting that spanking in the public schools is in every instance prohibited by the Eighth Amendment. My own view is that it is not. I only take issue with the extreme view of the majority that corporal punishment in public schools, no matter how barbaric, inhumane, or severe, is never limited by the Eighth Amendment. Where corporal punishment becomes so severe as to be unacceptable in a civilized society, I can see no reason that it should become any more acceptable just because it is inflicted on children in the public schools.

## II

The majority concedes that corporal punishment in the public schools implicates an interest protected by the Due Process Clause—the liberty interest of the student to be free from "bodily restraint and punishment" involving "appreciable physical pain" inflicted by persons acting under color of state law. *Ante,* at 674. The question remaining, as the majority recognizes, is what process is due.

The reason that the Constitution requires a State to provide "due process of law" when it punishes an individual for misconduct is to protect the individual from erroneous or mistaken punishment that the State would not have inflicted had it found the facts in a more reliable way. See, *e. g., Mathews* v. *Eldridge,* 424 U. S. 319, 335, 344 (1976). In *Goss* v. *Lopez,* 419 U. S. 565 (1975), the Court applied this principle to the school disciplinary process, holding that a student must be given an informal opportunity to be heard before he is finally suspended from public school.

> *"Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others;* and the controlling facts and the nature of the conduct under challenge are often disputed. *The risk of error is not at all trivial,* and it should be guarded against if that may be done without prohibitive cost or interference

with the educational process." *Id.*, at 580. (Emphasis added.)

To guard against this risk of punishing an innocent child, the Due Process Clause requires, not an "elaborate hearing" before a neutral party, but simply "an informal give-and-take between student and disciplinarian" which gives the student "an opportunity to explain his version of the facts." *Id.*, at 580, 582, 584.

The Court now holds that these "rudimentary precautions against unfair or mistaken findings of misconduct," *id.*, at 581, are not required if the student is punished with "appreciable physical pain" rather than with a suspension, even though both punishments deprive the student of a constitutionally protected interest. Although the respondent school authorities provide absolutely *no* process to the student before the punishment is finally inflicted, the majority concludes that the student is nonetheless given due process because he can later sue the teacher and recover damages if the punishment was "excessive."

This tort action is utterly inadequate to protect against erroneous infliction of punishment for two reasons.[10] First, under Florida law, a student punished for an act he did not commit cannot recover damages from a teacher "proceeding

---

[10] Here, as in *Goss* v. *Lopez*, 419 U. S. 565, 580–581, n. 9 (1975), the record suggests that there may be a substantial risk of error in the discipline administered by respondent school authorities. Respondents concede that some of the petitioners who were punished "denied misconduct" and that "in some cases the punishments may have been mistaken . . . ." Brief for Respondents 60–61. The Court of Appeals panel below noted numerous instances of students punished despite claims of innocence, 498 F. 2d 248, 256–258 (CA5 1974), and was "particularly disturbed by the testimony that whole classes of students were corporally punished for the misconduct of a few." *Id.*, at 268 n. 36. To the extent that the majority focuses on the incidence of and remedies for unduly severe punishments, it fails to address petitioners' claim that procedural safeguards are required to reduce the risk of punishments that are simply mistaken.

in utmost good faith . . . on the reports and advice of others," *supra*, at 692; the student has no remedy at all for punishment imposed on the basis of mistaken facts, at least as long as the punishment was reasonable from the point of view of the disciplinarian, uninformed by any prior hearing.[11] The "tra-

---

[11] The majority's assurances to the contrary, it is unclear to me whether and to what extent Florida law provides a damages action against school officials for excessive corporal punishment. Giving the majority the benefit of every doubt, I think it is fair to say that the most a student punished on the basis of mistaken allegations of misconduct can hope for in Florida is a recovery for unreasonable or bad-faith error. But I strongly suspect that even this remedy is not available.

Although the majority does not cite a single case decided under Florida law that recognizes a student's right to sue a school official to recover damages for excessive punishment, I am willing to assume that such a tort action does exist in Florida. I nevertheless have serious doubts about whether it would ever provide a recovery to a student simply because he was punished for an offense he did not commit. All the cases in other jurisdictions cited by the majority, *ante*, at 663 n. 28, involved allegations of punishment disproportionate to the misconduct with which the student was charged; none of the decisions even suggest that a student could recover by showing that the teacher incorrectly imposed punishment for something the student had not done. The majority appears to agree that the damages remedy is available only in cases of punishment unreasonable in light of the misconduct charged. It states: "*In those cases where severe punishment is contemplated,* the available civil and criminal sanctions for abuse . . . afford significant protection against unjustified corporal punishment." *Ante,* at 678. (Emphasis added.)

Even if the common-law remedy for excessive punishment extends to punishment that is "excessive" only in the sense that it is imposed on the basis of mistaken facts, the school authorities are still protected from personal liability by common-law immunity. (They are protected by statutory immunity for liability for enforcing disciplinary rules "[e]xcept in the case of excessive force or cruel and unusual punishment." Fla. Stat. Ann. § 232.275 (1976).) At a minimum, this immunity would protect school officials from damages liability for reasonable mistakes made in good faith. "Although there have been differing emphases and formulations of the common-law immunity of public school officials in cases of student expulsion or suspension, state courts have generally recognized that such

ditional common-law remedies" on which the majority relies, ante, at 672, thus do nothing to protect the student from the danger that concerned the Court in *Goss*—the risk of reasonable, good-faith mistake in the school disciplinary process.

Second, and more important, even if the student could sue for good-faith error in the infliction of punishment, the lawsuit occurs after the punishment has been finally imposed. The infliction of physical pain is final and irreparable; it cannot be undone in a subsequent proceeding. There is every reason to require, as the Court did in *Goss*, a few minutes of "informal give-and-take between student and disci-

officers should be protected from tort liability under state law for all good-faith, nonmalicious action taken to fulfill their official duties." *Wood* v. *Strickland,* 420 U. S. 308, 318 (1975) (adopting this rule for § 1983 suits involving school discipline) (footnote omitted); see *id.,* at 318 n. 9 (citing state cases). Florida has applied this rule to a police officer's determination of probable cause to arrest; the officer is not liable in damages for an arrest not based on probable cause if the officer reasonably believed that probable cause existed. *Miami* v. *Albro,* 120 So. 2d 23, 26 (Fla. Dist. Ct. App. 1960); cf. *Middleton* v. *Fort Walton Beach,* 113 So. 2d 431 (Fla. Dist. Ct. App. 1959) (police officer would be personally liable for intentional tort of making an arrest pursuant to warrant he knew to be void); *Wilson* v. *O'Neal,* 118 So. 2d 101 (Fla. Dist. Ct. App. 1960) (law enforcement officer not liable in damages for obtaining an arrest warrant on the basis of an incorrect identification). There is every reason to think that the Florida courts would apply a similar immunity standard in a hypothetical damages suit against a school disciplinarian.

A final limitation on the student's damages remedy under Florida law is that the student can recover only from the personal assets of the official; the school board's treasury is absolutely protected by sovereign immunity from damages for the torts of its agents. *Buck* v. *McLean,* 115 So. 2d 764 (Fla. Dist. Ct. App. 1959). A teacher's limited resources may deter the jury from awarding, or prevent the student from collecting, the full amount of damages to which he is entitled. Cf. *Bonner* v. *Coughlin,* 517 F. 2d 1311, 1319 n. 23 (CA7 1975), modified en banc, 545 F. 2d 565 (1976), cert. pending, No. 76-6204 (state-law remedy affords due process where no sovereign or official immunity bars tort suit for negligence by prison guard).

plinarian" as a "meaningful hedge" against the erroneous infliction of irreparable injury. 419 U. S., at 583–584.[12]

The majority's conclusion that a damages remedy for excessive corporal punishment affords adequate process rests on the novel theory that the State may punish an individual without giving him any opportunity to present his side of the story, as long as he can later recover damages from a state official if he is innocent. The logic of this theory would permit a State that punished speeding with a one-day jail sentence to make a driver serve his sentence first without a trial and then sue to recover damages for wrongful imprisonment.[13] Similarly, the State could finally take away a prisoner's good-time credits for alleged disciplinary infractions and require him to bring a damages suit after he was eventually released. There is no authority for this theory, nor does the majority purport to find any,[14] in the procedural due process

---

[12] Cf. *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 351–359 (1977). The Court there held that, in levying on a taxpayer's assets pursuant to a jeopardy assessment, revenue agents must obtain a warrant before searching the taxpayer's office but not before seizing his property in a manner that involves no invasion of privacy. *G. M. Leasing* thus reflects the principle that the case for advance procedural safeguards (such as a magistrate's determination of probable cause) is more compelling when the Government finally inflicts an injury that cannot be repaired in a subsequent judicial proceeding (invasion of privacy) than when it inflicts a temporary injury which can be undone (seizure of property). The infliction of bodily punishment, like the invasion of privacy, presents this most compelling case for advance procedural safeguards.

[13] To the extent that the majority attempts to find "a relevant analogy in the criminal law"—warrantless arrests on probable cause—to its holding here, *ante,* at 679–680 (and see *infra,* at 697–699), it has chosen the wrong analogy. If the majority forthrightly applied its present due process analysis to the area of criminal prosecutions, the police officer not only could arrest a suspect without a warrant but also could convict the suspect without a trial and sentence him to a short jail term. The accused would get his due process in a tort suit for false imprisonment.

[14] For the proposition that the need for a prior hearing is "significantly

decisions of this Court. Those cases have "consistently held that *some kind of hearing is required at some time before a person is finally deprived* of his property interests . . . [and that] a person's liberty is equally protected . . . ." *Wolff* v. *McDonnell,* 418 U. S. 539, 557–558 (1974). (Emphasis added.)

The majority attempts to support its novel theory by drawing an analogy to warrantless arrests on probable cause, which the Court has held reasonable under the Fourth Amendment. *United States* v. *Watson,* 423 U. S. 411 (1976). This analogy fails for two reasons. First, the particular requirements of the Fourth Amendment, rooted in the "ancient common-law rule[s]" regulating police practices, *id.,* at 418, must be understood in the context of the criminal justice system for which that Amendment was explicitly tailored. Thus in *Gerstein* v. *Pugh,* 420 U. S. 103 (1975), the Court, speaking through MR. JUSTICE POWELL, rejected the argument that procedural protections required in *Goss* and other due process

---

less compelling" where the State has preserved "common-law remedies," *ante,* at 679, 678, the majority cites only one case, *Bonner* v. *Coughlin, supra,* dismissing an allegation by a prisoner that prison guards acting under color of state law had deprived him of property without due process of law by negligently failing to close the door of his cell after a search, with the foreseeable consequence that his trial transcript was stolen. The panel held that the right to recover under state law for the negligence of state employees provided the prisoner with due process of law. The decision is distinguishable from the instant case on two grounds. First, recovery was not barred by sovereign or official immunity, and the state remedy ensured that the prisoner would be "made whole for any loss of property." 517 F. 2d, at 1319, and n. 23. Cf. *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 156 (1974). The point here, of course, is that the student cannot be made whole for the infliction of wrongful punishment. Second, the State cannot hold a pre-deprivation hearing where it does not intend to inflict the deprivation; the best it can do to protect the individual from an unauthorized and inadvertent act is to provide a damages remedy. 517 F. 2d, at 1319 n. 25. Here the deprivation is intentional and a prior hearing altogether feasible.

cases should be afforded to a criminal suspect arrested without a warrant.

> "The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial. . . . Moreover, the Fourth Amendment probable cause determination is in fact only the *first* stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct. *The relatively simple civil procedures (e. g., prior interview with school principal before suspension) presented in the [procedural due process] cases cited in the concurring opinion are inapposite and irrelevant in the wholly different context of the criminal justice system."* *Id.,* at 125 n. 27. (Emphasis in last sentence added.)

While a case dealing with warrantless arrests is perhaps not altogether "inapposite and irrelevant in the wholly different context" of the school disciplinary process, such a case is far weaker authority than procedural due process cases such as *Goss* v. *Lopez,* 419 U. S. 565 (1975), that deal with deprivations of liberty outside the criminal context.

Second, contrary to the majority's suggestion, *ante,* at 680 n. 48, the reason that the Court has upheld warrantless arrests on probable cause is not because the police officer's assessment of the facts "may be subjected to subsequent judicial scrutiny in a civil action against the law enforcement officer or in a suppression hearing . . . ." The reason that the Court has upheld arrests without warrants is that they are the *"first* stage of an elaborate system" of procedural protections, *Gerstein* v. *Pugh, supra,* at 125 n. 27, and that the State is *not* free to continue the deprivation beyond this first stage without procedures. The Constitution requires the State to provide

"a fair and reliable determination of probable cause" by a judicial officer prior to the imposition of *"any significant pretrial restraint of liberty"* other than "a brief period of detention to take the administrative steps incident to [a warrantless] arrest." *Id.,* at 114, 125. (Footnote omitted; emphasis added.) This "practical compromise" is made necessary because "requiring a magistrate's review of the factual justification prior to any arrest . . . would constitute an intolerable handicap for legitimate law enforcement," *id.,* at 113; but it is the probable-cause determination prior to any significant period of pretrial incarceration, rather than a damages action or suppression hearing, that affords the suspect due process.

There is, in short, no basis in logic or authority for the majority's suggestion that an action to recover damages for excessive corporal punishment "afford[s] substantially greater protection to the child than the informal conference mandated by *Goss*." [15] The majority purports to follow the settled principle that what process is due depends on " 'the risk of an erroneous deprivation of [the protected] interest . . . and the probable value, if any, of additional or substitute procedural safeguards' "; [16] it recognizes, as did *Goss,* the risk of error in the school disciplinary process [17] and concedes that "the child has a strong interest in procedural safeguards that minimize the risk of wrongful punishment . . . ," *ante,* at 676;

---

[15] *Ante,* at 678 n. 46.

[16] *Ante,* at 675, quoting *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976).

[17] *Ante,* at 676, quoting *Goss,* 419 U. S., at 579–580. Elsewhere in its opinion the majority asserts that the risk of error is "typically insignificant" because "paddlings are usually inflicted in response to conduct directly observed by teachers in their presence." *Ante,* at 677–678. But it cites no finding or evidence in the record for this assertion, and there is no such restriction in the statute or regulations authorizing corporal punishment. See *ante,* at 655 n. 6, 656 n. 7. Indeed, the panel below noted specific instances in which students were punished by an assistant to the principal who was not present when the alleged offenses were committed. 498 F. 2d, at 257, 259.

but it somehow concludes that this risk is adequately reduced by a damages remedy that never has been recognized by a Florida court, that leaves unprotected the innocent student punished by mistake, and that allows the State to punish first and hear the student's version of events later. I cannot agree.

The majority emphasizes, as did the dissenters in *Goss,* that even the "rudimentary precautions" required by that decision would impose some burden on the school disciplinary process. But those costs are no greater if the student is paddled rather than suspended; the risk of error in the punishment is no smaller; and the fear of "a significant intrusion" into the disciplinary process, *ante,* at 682 (cf. *Goss, supra,* at 585 (Powell, J., dissenting)), is just as exaggerated. The disciplinarian need only take a few minutes to give the student "notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U. S., at 581. In this context the Constitution requires, "if anything, less than a fair-minded school principal would impose upon himself" in order to avoid injustice.[18]  *Id.,* at 583.

I would reverse the judgment below.

Mr. Justice Stevens, dissenting.

Mr. Justice White's analysis of the Eighth Amendment issue is, I believe, unanswerable. I am also persuaded that his analysis of the procedural due process issue is correct. Notwithstanding my disagreement with the Court's holding

---

[18] My view here expressed that the minimal procedures of *Goss* are required for any corporal punishment implicating the student's liberty interest is, of course, not meant to imply that this minimum would be constitutionally sufficient no matter how severe the punishment inflicted. The Court made this reservation explicit in *Goss* by suggesting that more elaborate procedures such as witnesses, counsel, and cross-examination might well be required for suspensions longer than the 10-day maximum involved in that case. 419 U. S., at 583–584. A similar caveat is appropriate here.

on the latter question, my respect for Mr. Justice Powell's reasoning in Part IV–B of his opinion for the Court prompts these comments.

The constitutional prohibition of state deprivations of life, liberty, or property without due process of law does not, by its express language, require that a hearing be provided *before* any deprivation may occur. To be sure, the timing of the process may be a critical element in determining its adequacy—that is, in deciding what process is due in a particular context. Generally, adequate notice and a fair opportunity to be heard in advance of any deprivation of a constitutionally protected interest are essential. The Court has recognized, however, that the wording of the command that there shall be no deprivation "without" due process of law is consistent with the conclusion that a postdeprivation remedy is sometimes constitutionally sufficient.[1]

When only an invasion of a property interest is involved, there is a greater likelihood that a damages award will make a person completely whole than when an invasion of the individual's interest in freedom from bodily restraint and punishment has occurred. In the property context, therefore, frequently a postdeprivation state remedy may be all the process that the Fourteenth Amendment requires. It may also be true—although I do not express an opinion on the point—that an adequate state remedy for defamation may satisfy the due process requirement when a State has impaired an individual's interest in his reputation. On that hypothesis, the Court's analysis today gives rise to the thought that *Paul* v. *Davis*, 424 U. S. 693, may have been correctly decided on an incorrect rationale. Perhaps the Court will one day

---

[1] *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663; *Fuentes* v. *Shevin*, 407 U. S. 67, 82, 90–92; *Ewing* v. *Mytinger & Casselberry*, 339 U. S. 594, 598–600; *Phillips* v. *Commissioner*, 283 U. S. 589, 595–599; *Lawton* v. *Steele*, 152 U. S. 133, 140–142; cf. *Gerstein* v. *Pugh*, 420 U. S. 103, 113–114.

agree with MR. JUSTICE BRENNAN's appraisal of the importance of the constitutional interest at stake in *id.*, at 720–723, 734 (dissenting opinion), and nevertheless conclude that an adequate state remedy may prevent every state-inflicted injury to a person's reputation from violating 42 U. S. C. § 1983.[2]

---

[2] Cf. *Bonner* v. *Coughlin*, 517 F. 2d 1311, 1318–1320 (CA7 1975), modified en banc, 545 F. 2d 565 (1976), cert. pending, No. 76–6204; see also Judge Swygert's thoughtful opinion, *id.*, at 569–578.