Emilia KOSTIUK, Plaintiff,

v.

TOWN OF RIVERHEAD and John Sabotka, Defendants.

No. CV–81–3823.

United States District Court, E.D. New York.

Sept. 6, 1983.

Raoul E. Szabo, East Patchogue, N.Y., for plaintiff.

Richard A. Ehlers, Riverhead Town Atty., Riverhead, N.Y., for defendant, Town of Riverhead.

Peter S. Danowski, Jr., Behringer, Burke, Clifford, Danowski, Hurley & Sullivan, Riverhead, N.Y., for defendant, John Sabotka.

## MEMORANDUM AND ORDER

ALTIMARI, District Judge:

The dog has seldom been successful in pulling man up to its level of sagacity, but man has frequently dragged the dog down to his.

—James Thurber

## INTRODUCTION

This is an action brought under 42 U.S.C. § 1983, alleging a violation of plaintiff's constitutional rights, as a result of the overnight impoundment of her six year old Samoyed dog, named "Tarasbulba." This statute had a noble birth, as § 1 of the 1871 Civil Rights Act, 17 Stat. 13 (1871). Enacted by the Forty-Second Congress to combat the growing terrorism of the Ku Klux Klan, *see, Monroe v. Pape,* 365 U.S. 167, 171–87, 81 S.Ct. 473, 475–84, 5 L.Ed.2d 492 (1961), the current version of the statute has in recent years been utilized by plaintiffs with a wide assortment of grievances against state actors, some significant and some less so. This case presents an extreme example of the sort of corruption to which the statute is now subject. This Court believes, as do others, that the time has come to put a halt to these trivial actions, which mock the purposes for which this critical piece of legislation was intended. In the words of Judge Rubin, writing for the Fifth Circuit in *Raymon v. Alvord Independent School District,* 639 F.2d 257, 258 (5th Cir.1981):

> Federal courts are proper forums for the resolution of serious and substantial federal claims. They are frequently the last, and sometimes the only, resort for those who are oppressed by the denial of the rights given them by the Constitution and laws of the United States. Fulfilling this mission and the other jurisdiction conferred by acts of Congress has imposed on the federal courts a work load that taxes their capacity. Each litigant who improperly seeks federal judicial relief for a petty claim forces other litigants with more serious claims to await a day in court. When litigants improperly invoke the aid of a federal court to redress what is patently a trifling claim, the district court should not attempt to ascertain who was right or who was wrong in provoking the quarrel but should dispatch the matter quickly.

\*   \*   \*   \*   \*   \*

It all started quietly enough, in the Long Island Town of Riverhead, New York. Early in the morning of April 16, 1981, plaintiff and her two children left their dog, Tarasbulba, outside their home, unchained and without a collar, and departed for New York City to watch, perhaps symbolically, the circus. Upon their return, they learned that Tarasbulba had been picked up by Town Dogcatcher John Sabotka during their absence. Since the dog pound had already closed when they returned home, Tarasbulba, not for the first time, spent the night there before being picked up by plaintiff the following morning.

The seizure of Tarasbulba sparked this hotly litigated action, wherein plaintiff has sued both Sabotka and the Town of Riverhead for an unconstitutional deprivation of property, namely her dog. After defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6) was denied by another judge, all parties made summary judgment motions, and then continued to "supplement" them on a regular basis. Regrettably, none of the submissions included a case on "all fours" with this one.

Finally, the Court informed the parties by conference call that it would decide the motions on the basis of the record as it existed on July 8, 1983, inviting them to make any desired last-minute submissions. For the reasons given below, the Court now denies the plaintiff's motion and grants the motion of each defendant.

## FACTS

There are questions of fact that the assorted motion papers do not resolve, such as whether Tarasbulba was or was not on the Kostiuk property all morning before he was seized. Neither that question, however, nor any other question still unresolved, is a fact that is *material* to this determination. Fed.R.Civ.P. 56(c).

At the time of the incident in question, plaintiff, Emilia Kostiuk, had lived at the same address in the Town of Riverhead for approximately two years. Deposition of Emilia Kostiuk dated February 16, 1982 (hereinafter "Kostiuk dep."), at 4. Although the residence was occupied only by plaintiff and her two children, and of course, Tarasbulba, it was owned by plain-

tiff's parents. *Id.* at 4–6, 18. Until shortly before this incident, plaintiff had made no attempt to obtain a Riverhead dog license. *Id.* at 53–54. Indeed, what prompted plaintiff to finally apply for a Riverhead license was dogcatcher Sabotka's seizure of the dog a week or so earlier, when Tarasbulba was again outside, without restraints, or tags, or even a collar. *Id.* at 48–54, 65–66; deposition of John Sabotka dated August 18, 1982 (hereinafter "Sabotka dep."), at 23–24. Plaintiff brought no claim against either defendant in this case as a result of that seizure.

On that previous occasion, the dog spent the night at the pound, and was picked up the next morning by one of plaintiff's neighbors. Kostiuk dep. at 54–56. As a condition for the dog's release, the neighbor paid a redemption fee and filled out an application for a license on plaintiff's behalf. *Id.* at 65–66, 117. Through no fault of Sabotka's, when plaintiff did receive a Riverhead license, no dog tags were included, and the license itself was under plaintiff's previous, married name, "Emilia Correa." *Id.* at 120; Sabotka dep. at 24; "[Plaintiff's] Reply to Sabotka's Opposition and Motions to Dismiss and Summary Judgment," filed June 6, 1983, at 7, and plaintiff's proposed pretrial order exhibits 9, 15 and 16 (annexed), and deposition of Irene Pendzick, Riverhead Town Clerk (annexed).

As a result, Tarasbulba was still wearing no tag whatsoever, and not even a collar, when Sabotka picked him up again on April 16, 1981. Kostiuk dep. at 19, 23; Sabotka dep. at 21–22. While Sabotka concedes that Tarasbulba was actually seized on what he now knows to be the Kostiuk property, he claims the dog had been roaming off the property prior to that time. Sabotka dep. at 28–37. Plaintiff, on the other hand, claims that while her dog "walks around," Kostiuk dep. at 52, he never leaves the property and did not do so on this occasion. *Id.* at 24–25. As indicated earlier, this particular difference of opinion does not affect the outcome of the issue at hand.

Upon returning home from the circus, plaintiff learned her dog was again at the pound. She confirmed this for herself by driving to the pound, which was locked, and observing the dog. *Id.* at 29. She returned the next morning and retrieved her dog, after paying a five dollar fee. The dog was allegedly dirty and frightened, but did not otherwise appear to have suffered any harm. *Id.* at 32–33. Subsequently, however, plaintiff felt the dog wasn't "eating right," an observation she made after the previous impoundment, as well. *Id.* at 36, 62, 68. She took the dog to a veterinarian, but he did not prescribe any special diet. *Id.* at 36. Plaintiff, however, fashioned her own remedy, and switched Tarasbulba from meals like pork chops and potatoes to a diet consisting of more fish. *Id.* at 36–38. However, a true "meat and potatoes" dog, Tarasbulba resumed his former diet within a few months and showed no lasting effects from his confrontation with Sabotka, except for becoming "emotional" in the presence of someone in uniform. *Id.* at 39–41.

Plaintiff, however, continued to make no bones about her unhappiness, and her voice carried to kitchens and kennels across the land. *See, e.g.,* Kostiuk dep. at 115; *Animal Rights Law Reporter* (October 1982) (published by Society for Animal Rights, Inc., Clarks Summit, Pa.), at 5–6.[1] Plaintiff took her complaints to the police, the town council, the American Society for the Prevention of Cruelty to Animals (ASPCA), and the American Civil Liberties Union (ACLU), among others. Indeed, a few days after the incident, her protestations resulted in a meeting of the Riverhead Town Board. Kostiuk dep. at 74; transcript annexed to Plaintiff's Motion for Summary Judgment and Town of Riverhead's letter dated July 6, 1983. Shortly thereafter, the five dollar fee paid by plaintiff to redeem her dog from the pound was returned to her. Affidavit of Emilia Kostiuk dated

---

1. The latter publication referred to this as an "imaginative action." While the Court joins in that assessment, it is not the sort of action that deserves, or was ever intended to deserve, the protection afforded by 42 U.S.C. § 1983.

May 4, 1983, Exhibit 1 to Plaintiff's Summary Judgment Motion.

Plaintiff, however, was still not mollified. By Notice of Claim, received July 1, 1981, by the Riverhead Town Clerk, plaintiff claimed damages arising out of the overnight impoundment of Tarasbulba on August 16, 1981. Pursuant to N.Y.Gen. Mun.Law § 50–h (McKinney 1977), a hearing on the claim, at which plaintiff testified, was held on October 20, 1981. One month later, she filed the instant action, pursuant to 42 U.S.C. § 1983 and attaching pendent state claims, against both Sabotka and the Town of Riverhead. Plaintiff seeks $900,000 in punitive damages and $100,000 in compensatory damages, including damages for plaintiff's mental and emotional distress. No claim has been made for the dog's mental distress.

The judge previously assigned this case granted the Town's motion to dismiss plaintiff's claim for punitive damages against it, on January 26, 1982. When defendants subsequently moved to dismiss the entire action, relying on *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), plaintiff filed an action in Suffolk County Supreme Court similar to that then pending in federal court, by way of another summons with Notice of Claim. The state action was discontinued after the federal judge denied defendants' motion, saying, "Defendants have not demonstrated that there is no set of facts that, if proved, would constitute a violation of plaintiff's constitutional rights." *See,* Memorandum and Order of June 28, 1982, at 8. His opinion, however, explicitly left open the possibility of a different result, including an award of attorneys' fees to the defendants, after the record was amplified, as it is now.

## DISCUSSION

■ Preliminarily, the Court finds no merit in plaintiff's argument that this Court is bound, in deciding the motion at hand, by the previous judge's decision on defendants' motions to dismiss. The law of the case doctrine does not necessarily apply where even the same question is presented to different judges of a single district court. 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 794–95 (1981). For instance, it has been held that denial of a summary judgment motion by one judge does not foreclose grant of that motion by another judge. *Id.; Dictograph Products Co. v. Sonotone Corp.,* 230 F.2d 131, 134–36 (2d Cir.1956) (Hand, J.).

■ The motions at hand, however, do not present the same question as that previously decided. The prior motion was brought under Fed.R.Civ.P. 12(b)(6). The purpose of such a motion is to test the formal sufficiency of the statement of the claim for relief. As such, the court's inquiry is, and was in this case, essentially limited to the content of the complaint. 5 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 1356, at 590 and supp. 160 (1969 and supp. 1983). In contrast, the summary judgment motions before this Court go to the merits of the challenged claims and defenses and involve not only the pleadings, but also on the depositions, affidavits, transcripts, and all the other forms of evidence presently "dogging" this file. *See,* 10 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 2713, at 593 (1983); *see, also, George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 553–54 (2d Cir.1977). The previous judge could have himself granted defendants' summary judgment motions despite denying their motions to dismiss, and he even suggested that possibility in his opinion.

The basis of plaintiff's 1983 action is the Fourteenth Amendment, which provides that no person shall be deprived of "life, liberty or property, without due process of law." Simply stated, plaintiff alleges she was deprived of her dog without due process of law and thereby denied her Fourteenth Amendment rights. Defendants are both entitled to summary judgment on this claim for at least three reasons:

(1) Plaintiff suffered no deprivation of property which rose to a constitutional level;

(2) Even if she did, there were adequate post-deprivation state remedies available and, in fact, utilized by her, which supplied the requisite due process; and

(3) Her claim is *de minimis,* so much so that this Court lacks jurisdiction over it.

In addition, the Town of Riverhead is entitled to summary judgment on a separate ground, since it did not cause its employee, Sabotka, to violate plaintiff's constitutional rights under color of any municipal policy or practice. *See, Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690–92, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Sabotka, in turn, is also entitled to summary judgment on a separate ground, in that his actions fell within the scope of a qualified immunity.

1. *No constitutional "deprivation" of property occurred in this case.*

In the landmark case of *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), the Supreme Court counseled:

> "... in any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."

*See, also, Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). Defendant Sabotka was acting in his capacity as Town Dogcatcher when he impounded Tarasbulba, and the dog, in turn, was the property of plaintiff. *See, Sentell v. New Orleans & C.R. Co.,* 166 U.S. 698, 17 S.Ct. 693, 41 L.Ed. 1169 (1897); *Cole v. Creamer, et al.,* (D.Me.), *reported in Animal Rights Law Reporter* (January 1980), at 2. However, Tarasbulba's overnight impoundment does not rise to the level of a constitutional deprivation.

Plaintiff's claim boils down to a contention that, even though the dog was wearing no identification when it was picked up, and even though the license that was issued to plaintiff was under the name "Correa" instead of "Kostiuk", and even though a neighbor, rather than plaintiff herself, retrieved the dog after the first impoundment, Sabotka somehow "knew", or should have known, that the large white dog he picked up on August 16, 1981, was plaintiff's dog, and was therefore "home" when he was picked up, and was also licensed. Sabotka claims he did not know this particular dog, this particular dog owner, or any relationship the two may have had.[2] Sabotka dep. at 20–24. The record is devoid of any evidence to the contrary.

Ignoring the fact that the seizure in question was arguably lawful on its face, plaintiff did not suffer a deprivation of property warranting Fourteenth Amendment protection, regardless of the due process protections surrounding that deprivation. As Justice Stewart said, concurring in *Parratt v. Taylor, supra,* 451 U.S. at 544–45, 101 S.Ct. at 1917–18:

> It seems to me extremely doubtful that the property loss here, even though presumably caused by the negligence of

---

**2.** N.Y. Agriculture and Markets Law § 118(1) (McKinney Supp.1982), provides:

> (1) Any dog control officer or peace officer, acting pursuant to his special duties, or police officer in the employ of or under contract to a municipality shall seize:
>
> (a) any dog which is not identified and which is not on the owner's premises; and
>
> (b) any dog which is not licensed, whether on or off the owner's premises.

RIVERHEAD TOWN ORDINANCE § 58–3 provides, in part:

> It shall be the duty of any police officer or the Dog Warden or other authority designated by the Town Board of the Town of River-

head to apprehend and impound any dog not under reasonable control of its owner which:

> A. Is an unlicensed dog.
>
> B. Is running at large contrary to the provisions of this chapter.

RIVERHEAD TOWN ORDINANCE § 58–1 defines "not under reasonable control" as follows:

> As applied to a dog, means not upon the premises of its owner and not within the immediate custody of and obedient to its owner, or one causing damage to a person or property of anyone other than the owner, except in defense of its owner, the owner's family or property.

state agents, is the kind of deprivation of property to which the Fourteenth Amendment is addressed.... To hold that this kind of loss is a deprivation of property within the meaning of the Fourteenth Amendment seems not only to trivialize, but grossly to distort the meaning and intent of the Constitution.

*See, also,* concurring opinion of Justice Powell, *id.* at 546–54, 101 S.Ct. at 1918–23; *Polite v. Diehl,* 507 F.2d 119, 143 (3d Cir. 1974) (Kalodner, J., concurring in part and dissenting in part) ("... there is no 'wrongful deprivation of property ... under color of state law' when a policeman orders an automobile with a smashed radiator towed away while he takes its operator and passengers to a hospital, and the car is returned to its owner the next morning.") In this case, plaintiff knew her dog was at the pound from the moment she returned home from the circus, Kostiuk dep. at 46, and she also knew that she could, as she did, get him back the following morning. She confirmed both his whereabouts and his overall well-being by visiting the pound that evening. She never was, and she knew she never would be, "finally" deprived of any property, *Parratt v. Taylor, supra* 451 U.S. at 540, 101 S.Ct. at 1915. *See, also, Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982).

This Court does not hold today that a person who is not *permanently* deprived of his property may never have a Fourteenth Amendment claim. But it does hold that where, as here, the person knows where his or her property is, knows he or she will soon get it back, in this case after one night, and the property is not expected to be and is not, in fact, permanently damaged, then there is no constitutional deprivation of property.

2. *There was no deprivation of property without due process.*

Even if this impound were considered to be a deprivation of constitutional magnitude, it was not without due process of law and therefore still not violative of the Fourteenth Amendment. The Supreme Court held in *Parratt v. Taylor, supra,* that at least where a predeprivation hearing is meaningless or impracticable and state tort remedies can fully compensate the victim for his or her loss, state postdeprivation remedies can provide the requisite due process. *See, also, Love v. Coughlin,* 714 F.2d 207 No. 82–2338 (2d Cir.1983).

This case meets those criteria. Moreover, plaintiff was not without notice that her dog might be picked up if it was unlicensed and/or running at large. Not only is seizure of the dog under such circumstances authorized by both state and local law,[2] but plaintiff had also received a final written warning about Tarasbulba running at large in April 1980. *See,* attachment # 1 to letter of Peter S. Danowski, Jr., Esq., dated June 28, 1983. Furthermore, the dog was impounded for being without a license shortly before the incident in question. The law calls for notification of the owner upon seizure of an identified dog. N.Y.Agric. & Mkts.Law § 118(6) (McKinney Supp.1982). Tarasbulba had no dog tag and was therefore not an "identified dog," N.Y.Agric. & Mkts.Law §§ 108(12), 112(1) (McKinney Supp.1982). Regardless, the post-impoundment notice provisions provided for by statute were unnecessary in plaintiff's case, because on each occasion, she redeemed her dog the following morning, either by herself or through a neighbor.

Whatever ounce of merit might be squeezed from plaintiff's action, it is essentially a simple tort claim that could have been and should have been pursued in the state courts. *See,* Memorandum and Order dated June 28, 1982, at 4; *Parratt v. Taylor, supra; Baker v. McCollan, supra,* 443 U.S. at 142–44, 99 S.Ct. at 2693–94; *Ingraham v. Wright,* 430 U.S. 651, 677, 97 S.Ct. 1401, 1415, 51 L.Ed.2d 711 (1977); *Paul v. Davis,* 424 U.S. 693, 697, 96 S.Ct. 1155, 1159, 47 L.Ed.2d 405 (1976). It is irrelevant whether, assuming a constitutional deprivation occurred, it was intentionally or negligently caused. This Court joins with those others which read *Parratt* and other recent Supreme Court decisions, *e.g., Ingraham v. Wright, supra,* to apply to intentional or

reckless deprivations of liberty or property. *See, e.g., Barnier v. Szentmiklosi,* 565 F.Supp. 869 (1983) (E.D.Mich.) (assault and battery by policemen); *Engblom v. Carey,* 677 F.2d 957, 964–66 (2d Cir.1982) (striking corrections officers evicted from facility-residences without notice or consent); *Palmer v. Hudson,* 697 F.2d 1220, 1222–23 (4th Cir.1983) (intentional destruction of a prisoner's property); *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1352 (9th Cir.1981), *aff'd on other grounds sub nom., Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) (assault and battery by football coach); *Frazier v. Collins,* 538 F.Supp. 603, 605 (E.D.Va.1982) (intentional withholding of a prisoner's property); *Sheppard v. Moore,* 514 F.Supp. 1372, 1375–78 (M.D.N.C.1981) (intentional refusal to return property seized as part of a criminal investigation).

In this case, not only were postdeprivation state remedies available to plaintiff, but she actually availed herself of them. Plaintiff testified at a hearing on her claim pursuant to N.Y.Gen.Mun.Law § 50–h (McKinney 1977). In June 1982, fearful that her federal claim was about to be dismissed, she sought the same relief by way of a state tort action. Assuming, as plaintiff does, that her claim warranted a lawsuit, that was the proper forum.

3. *Plaintiff's claim is de minimis.*

■ This Court also finds plaintiff's claim so *de minimis* that it must fail for want of jurisdiction. Admittedly, a plurality of Justices in *Parratt* found that a prisoner's hobby kit worth $23.50 was "property" within the meaning of the Constitution. However, prisoners are particularly vulnerable to the sort of deprivation presented in that case. *See, Withers v. Levine,* 615 F.2d 158, 162 (4th Cir.1980); *see, also, Russell v. Bodner,* 489 F.2d 280 (3d Cir.1973); *Love v. Coughlin, supra.*

In other cases, not involving prisoners, the Supreme Court has suggested that the Constitution does not protect *de minimis* interests. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2733, 2737, 73 L.Ed.2d 396 (1982), *citing, Butz v. Econo-*

*mou,* 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911–12, 57 L.Ed.2d 895 (1978) (... insubstantial claims should not proceed to trial."); *Ingraham v. Wright, supra,* 430 U.S. at 674, 97 S.Ct. at 1414 ("There is, of course, a *de minimis* level of imposition [on liberty interests] with which the Constitution is not concerned."); *Fuentes v. Shevin,* 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972) ("Any *significant* taking of property by the state is within the purview of the Due Process Clause.") (emphasis added).

Other courts have not hesitated to find that claims as groundless and unreasonable as those in this case were *de minimis* or frivolous. *See, e.g., Harbulak v. County of Suffolk,* 654 F.2d 194, 195 (2d Cir.1981) (claim that motorist's civil rights were violated when policeman, on motorist's failure to accept traffic summonses, reached across the motorist's body and placed the summonses on the dashboard, was "wholly frivolous."); *Raymon v. Alvord Independent School District,* 639 F.2d 257, 258 (5th Cir. 1981) (claim that a decrease in grade point average from 95.478 to 95.413 constituted a deprivation of a vested property or liberty interest was "patently insubstantial."); *Pitts v. Griffin,* 518 F.2d 72 (8th Cir.1975) (complaint involving confiscation of prisoner's multi-frequency radio pursuant to prison regulation limiting radio use to AM frequency was frivolous); *McKee v. Turner,* 491 F.2d 1106 (9th Cir.1974) (request for an apology rendered case *de minimis*); *Northern v. Nelson,* 448 F.2d 1266 (9th Cir.1971) (damage claim by prisoner for confiscation of religious newspapers worth $1.05 was *de minimis*); *Lowenstein v. McLaughlin,* 295 F.Supp. 638 (D.Mass.1969) (damage suffered by motorist required to surrender his driver's license for 1–2 hours because of conviction for leaving the scene of an accident, though acquitted on appeal, was *de minimis*). Plaintiff's case is no different. The five dollars she paid to redeem her dog from the pound was returned to her the following week; the grooming the dog received after his redemption was no more than that which was part of his customary care; and while plaintiff started feeding

him more fish, that was her own choice, since a veterinarian had found the dog was not sick nor in need of a special diet. The significance of plaintiff's case is not heightened by the inclusion of an exaggerated damage claim. *See, e.g., Harbulak v. County of Suffolk, supra; Lowenstein v. McLaughlin, supra.*

■ A complaint that alleges the existence of a frivolous or insubstantial federal question is not sufficient to establish jurisdiction in a federal court. *Raymon v. Alvord Independent School District, supra; Zamora v. Pomeroy,* 639 F.2d 662, 670 (10th Cir.1981). The record having now been amplified, it is clear that this case does not rise above the level of frivolity. Accordingly, on this ground alone, the action should now be dismissed, including the pendent state claims. *See, United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

4. *No municipal policy or practice caused Sabotka's actions.*

The Town of Riverhead could be held liable on plaintiff's § 1983 claim only if Sabotka's actions violated plaintiff's constitutional rights, and those actions were "caused" by an official municipal policy or unofficial custom or practice; the Town cannot simply be held liable because it may have employed a tortfeasor. *Monell v. New York City Dept. of Social Services, supra. See, also, Turpin v. Mailet,* 619 F.2d 196, 199 (2d Cir.1980).

■ In this case, the record is clear that the Town's only official "policy" in this regard was that Sabotka should act in accordance with the appropriate state and local laws. *See,* deposition of Town Supervisor Joseph Janoski notarized October 8, 1982, annexed to plaintiff's Motion for Summary Judgment (hereinafter "Janoski dep."), at 8; Affidavit of Richard Ehlers, Esq., dated June 1, 1983, and annexed exhibits. Indeed, to the extent the Town followed any other custom or practice, it was to discourage Sabotka from taking

dogs off private property, even though he was authorized by both state and local law to do so under certain circumstances.[3] *See,* Janoski dep. at 9, Synopsis of December 12, 1980 meeting, annexed to Affidavit of Karen T. Heppner dated June 1, 1983, at 8.

Where those circumstances exist, a dogcatcher or peace officer is permitted to seize a dog on the owner's premises, and Sabotka freely admits to doing so. Sabotka dep. at 14–20. There is no evidence he acted without authorization in other instances, and even if he were found to have done so in this single incident, that would not give rise to an inference of an illegal policy or practice, absent more evidence of supervisory indifference than exists in this case. *See, Turpin v. Mailet, supra,* at 202; *Cattan v. City of New York,* 523 F.Supp. 598, 600–601 (S.D.N.Y.1981).

5. *Sabotka acted within the scope of a qualified immunity.*

■ This case therefore does not test the constitutionality of a town dogcatcher's arbitrarily or maliciously taking dogs with proper licenses and identification tags off their owners' properties. It is worth repeating that this dog was not wearing a dog tag or even a collar when Sabotka picked him up, and the license which was issued to the owner was under a different name. Sabotka dep. at 20–24. To the average observer, even the average dogcatcher, Tarasbulba was neither identified nor licensed, nor necessarily on his owner's property, when he was picked up on April 16, 1981. The only way Sabotka could have known the dog was licensed was if he knew both that Emilia Correa and Emilia Kostiuk were one and the same person, and that the large white dog he picked up belonged to that person. The record shows Sabotka neither knew, nor could he reasonably have been expected to know, either fact. Since it was reasonable for Sabotka to conclude the dog was not licensed, he was authorized by N.Y.Agric. & Mkts.Law § 118(1)(b) (McKinney Supp.1982) to seize him, even if

---

**3.** *Id.*

he knew the dog was on his owner's premises.

In *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975), the Supreme Court indicated that, at least in the context of school discipline presented by the facts of that case, individual defendants in § 1983 actions were liable for damage awards only for "particularly egregious conduct—something more than a trivial mistake in judgment," Whitman, *Constitutional Torts,* 79 Mich.L.Rev. 5, 65 (1980). The *Wood* Court identified both "objective" and "subjective" aspects to the defense of qualified or "good faith" immunity, *supra,* at 321–22, 95 S.Ct. at 1000–01. However, while there is no evidence to indicate that Sabotka did not act "sincerely" and with a belief that he was "doing right," *id.,* the "subjective" component of the defense was limited in *Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2737–39. There, after iterating their impatience with trivial lawsuits, *id.* at 2733, 2737, the Court held, *id.* at 2738:

> . . . government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*See, also, Wolfel v. Sanborn,* 691 F.2d 270 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 751, 74 L.Ed.2d 969 (1983) (*Harlow* retroactively applied).

The question of Sabotka's good faith, qualified immunity was pleaded as an affirmative defense, and it is therefore properly before this Court in the summary judgment context. *See, Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2737–38; *Green v. White,* 693 F.2d 45, 47 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983); *Juncker v. Tinney,* 549 F.Supp. 574, 579 (D.Md.1982). Accordingly, the Court finds that in seizing plaintiff's dog, Sabotka was performing a discretionary function, thereby making qualified immunity available to him as a potential defense, and that the defense applies to this case, as his conduct in this instance did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2738.

**6. *Plaintiff should pay part of defendants' attorneys' fees.***

▉ This Court is not insensitive to the feeling plaintiff obviously has for her pet. The intensity of plaintiff's feelings, however, is no measure of the merits of her lawsuit. Plaintiff was specifically warned that attorneys' fees might be awarded against her if this action were later found to be, as this Court now concludes it is, "plainly frivolous." Memorandum and Order dated June 28, 1982, at 8.

As amended by the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, 42 U.S.C. § 1988 authorizes the court, in its discretion, to allow a reasonable attorney's fee as part of the prevailing party's costs. Pursuant to this section, the Second Circuit found a district judge abused his discretion in denying an award of attorney's fees to the defendant, in *Harbulak v. County of Suffolk, supra.* This claim, in which plaintiff is represented by counsel, is at least as frivolous as that in the *Harbulak* case, if not more so. *See also, Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 1937 n. 2, 76 L.Ed.2d 40 (1983) ("A prevailing defendant may recover an attorney's fee [under 42 U.S.C. § 1988] only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant."); *Tatum v. Regents of Nebraska,* —— U.S. ——, 103 S.Ct. 3084, 77 L.Ed.2d 1346 (1983) (respondent awarded $500 in damages where petitioner's appeal was frivolous). The Town of Riverhead has assumed the legal expenses of defendant Sabotka. Accordingly, the Court orders that plaintiff pay the Town of Riverhead $250 in attorneys' fees. This amount does not, and is not intended to, approach a figure that would fully compensate defendants for their legal expenses.[4] However, it will help

---

4. Since it is beyond dispute that the actual legal expenses of both defendants far exceeded this

defray those expenses without subjecting plaintiff to undue financial hardship. Presumably, it will also be sufficient to serve as a caution to potential litigants with similar claims.

Hopefully, cases such as this will diminish in number if plaintiffs are not allowed to pursue them with impunity. For judges must be concerned not only with protecting the rights of defendants against frivolous lawsuits, but also those of plaintiffs with serious claims requiring the attention of the federal courts.

CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied and defendant's motions are granted. Plaintiff is directed to pay $250 in attorneys' fees to the Town of Riverhead. The Clerk is directed to enter judgment accordingly.

SO ORDERED.

amount, the Court will not require defendants to produce contemporaneous time records. See, *New York State Association for Retarded Children, Inc. v. Carey,* 711 F.2d 1136 (2d Cir. 1983).