Edward P. NEWMAN, Plaintiff,

v.

VILLAGE OF HINSDALE, Aaron Mitton, sued individually and in his official capacity as Village of Hinsdale police officer, and Kenneth Felbinger, sued individually and in his official capacity as Chief of Police of the Hinsdale Police Department, Defendants.

No. 84 C 2616.

United States District Court,
N.D. Illinois, E.D.

Sept. 25, 1984.

David Belofsky, John O. Demaret & Assoc., Chicago, Ill., for plaintiff.

Peter M. Rosenthal, Ancel, Glink, Diamond, Murphy & Cope, P.C., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

KOCORAS, District Judge.

In a paroxysm of hyperbole, the plaintiff has described this as a case which "shocks the conscience [and] is fundamentally offensive to civilized society." Complaint ¶¶ 17, 23. He is right in a very limited sense, but not at all in the way he thinks.

It can be said with a substantial degree of certainty that when Representative James Madison, who was later to become the fourth president of the United States and who has been called the "Father of the Constitution," stood before the First Congress on June 8, 1789 and explained his proposed bill of rights, neither he nor any of our nation's other forefathers had a situation like this in mind. Nor is it even remotely likely that anyone conceived of something like this in those dark days following the Civil War when Congress enacted section 1 of the Ku Klux Klan Act of 1871 (now 42 U.S.C. § 1983) to stem the tide of lynchings and other horrors perpetrated by the nightriders against the newly-freed slaves and their supporters. Only after 1976, when Congress passed a law that virtually guaranteed a plaintiff an award of attorney's fees if he managed to "prevail" in a civil rights case, did lawsuits

like this become not only thinkable but commonplace. With an assurance that their fees would be paid by the defendant if their client "prevailed" in any way, including settlement of a bogus suit for its nuisance value, and with no appreciable downside (losing plaintiffs almost never have to pay a victorious defendant's fees under the statute), lawyers flocked to the federal courts to file "civil rights" cases.[1] Some good has come of this, of course, but many of these so-called civil rights actions have proven to have nothing whatever to do with civil rights as that term is normally understood. Instead, the Constitution has been debauched as lawyers, "not overly hindered by the courts,"[2] have endeavored to transform even the most petty complaints against local governments into federal cases of constitutional dimension. Rather than vindicating fundamental rights, such lawsuits over the trivial annoyances of everyday life actually diminish public esteem for the Constitution.[3] When every misstep by government, no matter how slight, is seized upon as creating a cause of action entitling its holder to a chance at receiving a cash jackpot from a federal jury, plus an award of attorney's fees as an automatic bonus, important values are lost and the Constitution comes to be looked upon as a sort of lottery ticket.

---

1. As Justice Powell recently observed, section 1988 "has become a major additional source of litigation. Since its enactment in 1976, suits against state officials under § 1983 have increased geometrically." *Pulliam v. Allen,* — U.S. —, 104 S.Ct. 1970, 1988 & n. 16, 80 L.Ed.2d 565 (1984) (Powell, J., dissenting). One state official recently commented to a Senate subcommittee that the growing number of "section 1983 actions highlight[s] the fact that when the government decides to pay people for anything, it will get more of it. We start paying people for litigation; we are going to get more litigation." *Federalism and the Federal Judiciary: Hearings Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary,* 98th Cong., 1st Sess. 12 (1983) (statement of John D. Ashcroft, Attorney General of the State of Missouri).

It is accurate, and in this case particularly fitting, to note that the federal courts in recent years have been snowed under with section 1983 suits. In a distressingly great number of these cases, "constitutional law has been trivialized, and federal courts often have been converted into small-claims tribunals." *Parratt v. Taylor,* 451 U.S. 527, 554 n. 13, 101 S.Ct. 1908, 1922 n. 13, 68 L.Ed.2d 420 (1981) (Powell, J., concurring). Statistics documenting the extraordinary increase in the number of lawsuits filed under section 1983 are cited in *Webster v. City of Houston,* 735 F.2d 838, 848 n. 24 (5th Cir.1984); *Skevofilax v. Quigley,* 586 F.Supp. 532, 535 n. 2 (D.N.J.1984); *Thurman v. Rose,* 575 F.Supp. 1488, 1491 n. 4 (N.D.Ind.1983); *Barnier v. Szentmiklosi,* 565 F.Supp. 869, 873–74 (E.D.Mich.1983). *See also Loyd v. Loyd,* 731 F.2d 393, 398 (7th Cir.1984) ("the number of pages of annotations [of § 1983 cases] in West's United States Code Annotated has risen from more than 56 pages in the 1957 edition ... to a staggering number in excess of approximately 1364 pages [today]").

2. *Loyd,* note 1, *supra,* at 398.

3. Anyone who doubts this has only to monitor the advance sheets and the newspapers to see that it is so. Encouraged by certain court decisions and statutes such as section 1988, many citizens have begun to view the Constitution not just as a source of fundamental human rights but as a panacea for every wrong, real or imagined. This is a view that would surely astound the framers of the Constitution. A couple of examples will illustrate how far this has gone in some instances.

In a recent news article, it was reported that some residents of the Long Island town of Smithtown, New York were howling mad over a new ordinance that sought to limit the noise created by barking dogs. These people were quoted as vowing "to fight for 'our *dogs*' constitutional rights.'" Chicago Tribune, Aug. 17, 1984, § 1, at 10 (emphasis added). Presumably, the proposed constitutional challenge to this ordinance will be mounted on equal protection grounds since the law singles out dogs while leaving other creatures free to raise all the ruckus they want. Unfortunately, the irate canine owners will probably be able to find an enterprising lawyer who will file a federal lawsuit for them on the theory that not only man but also his best friend is entitled to protection under our Constitution.

This would not be the first time the Constitution has been invoked against someone who interferred with a pooch's liberty on Long Island. In the case of *Kostiuk v. Town of Riverhead,* 570 F.Supp. 603 (E.D.N.Y.1983), a municipal dogcatcher found himself standing before a federal court as an accused civil rights violator after he hauled in a mutt he found prowling the streets without a tag. The beast's mistress had to pay five dollars to retrieve him from the pound after he had been locked up overnight, and she tracked down an attorney who agreed with her that this amounted to a constitutional violation warranting a federal lawsuit.

This "civil rights" case arises because a sidewalk had some snow on it one night last winter. Because there was snow on the sidewalk, Edward P. Newman, a resident of the Chicago suburb of Hinsdale, decided to walk in the street. A policeman came along and told Newman to walk on the sidewalk. Newman disobeyed the officer and continued to walk in the street. The officer then issued Newman a traffic ticket for walking on a roadway when he should have been using the sidewalk, a violation of the Illinois Vehicle Code. Ill. Rev.Stat. ch. 95½, ¶ 11–1007(a). A few days later Newman complained to the chief of police that he did not deserve the ticket, but despite Newman's protestations of innocence the chief "failed to terminate or otherwise voluntarily dismiss the citation." Complaint ¶ 20. Two weeks after griping unsuccessfully to the chief, Newman showed up in traffic court and the ticket was dismissed.

That is it. That is the incident Newman says "shocks the conscience [and] is fundamentally offensive to civilized society." He was not beaten by the police.[4] He was not compelled to strip naked and have a policeman's finger stuck up his anus to check for contraband.[5] He was not locked in a cell for a lengthy period without being taken before a magistrate.[6] He simply got a ticket. Now, having managed to win in his local traffic court, Newman has taken the offensive by filing this federal lawsuit under 42 U.S.C. § 1983 in the United States District Court for the Northern District of Illinois. His two-count complaint is based on the notion that the policeman violated his fourth amendment rights by stopping him to issue the traffic ticket. To redress this supposed injustice Newman demands $150,000 in damages in each of his two counts. Named as defendants are the policeman who wrote the ticket, the chief of police, and the Village of Hinsdale. The defendants have moved to dismiss the complaint.[7]

By rights, if everything was on the up-and-up, Newman would have lost in traffic court, and regardless of what happened in traffic court could not even have argued that he had grounds for this "civil rights" suit, had the ticket been written prior to January 1, 1976. Before that date the Illinois Vehicle Code stated:

> Where sidewalks are provided it is unlawful for any pedestrian to walk along and upon an adjacent roadway except at a crosswalk.

Ill.Rev.Stat. ch. 95½, § 11–1007(b). This provision was amended effective January 1, 1976 to read as follows:

> Where a sidewalk is provided and its use is practicable, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.

Ill.Rev.Stat. ch. 95½, ¶ 11–1007(a). Newman's entire lawsuit rests upon his allegation that the sidewalk on which he otherwise should have been walking was "obstructed by and rendered impassable from large amounts of snow which had previously fallen thereon during the previous twenty-four hours."[8] Complaint ¶ 9. This ac-

---

**4.** *E.g., Lenard v. Argento,* 699 F.2d 874 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983).

**5.** *McKinley v. Trattles,* 732 F.2d 1320 (7th Cir. 1984).

**6.** *E.g., Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

**7.** All defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In addition, the individual policeman has raised the defense of insufficiency of service of process. Fed.R.Civ.P. 12(b)(5). There is no indication in the record that the officer was properly served; however, rather than dismiss the complaint as to him on this ground it is more efficient in this case to address the officer's rule 12(b)(6) motion.

**8.** There is reason to question Newman's good faith in making this allegation. The records of the National Oceanic and Atmospheric Administration—federal statistics of which this court may take judicial notice, *see, e.g.,* Fed.R.Evid. 201(b)(2); *Indianapolis Airport Authority v. American Airlines, Inc.,* 733 F.2d 1262, 1266–67 (7th Cir.1984)—reveal that the snowfall was far less substantial than Newman suggests. At 6 a.m. on the morning of December 27, 1983, there was three inches of snow on the ground in areas that had not been cleared or packed

cumulation of snow, he argues, deprived the policeman of probable cause to stop him for unlawfully walking in the street under the amended version of the statute.

The 1976 amendment was enacted, in the words of Illinois State Senator Hall, as one of a "whole series of bills that have to do with the safety factor." H.B. 2210, 79th Ill.Gen. Assembly, 1st Sess., 1975 Senate Debates June 19, 1975, p. 205. The overarching purpose of this legislation was thus to increase the safety of pedestrians, not to enhance their convenience.[9] By inserting the phrase "and its use is practicable" into the statute that requires pedestrians to use sidewalks where they are provided, the Illinois legislature did not intend to give pedestrians a license to take to the streets after every snowfall. "Practicable," as used in this statute, means "performable, feasible, possible," Black's Law Dictionary 1055, or "capable of being put into practice, done, or accomplished," Webster's Third New International Dictionary 1780; Random House College Dictionary 1040. When the distinction between this word and "practical" is kept in mind, see, e.g., H.W. Fowler, A Dictionary of Modern English Usage 469 (2d ed. 1965); H. Shaw, Dictionary of Problem Words and Expressions 187–88 (1975); Houghton Mifflin Company, The Written Word 282–83 (1977), it is apparent that a natural accumulation of snow on a sidewalk is not the type of obstacle the legislature contemplated as entitling pedestrians to walk in the street. In contrast to a sidewalk that is torn up or barricaded because of construction work,

for example, a sidewalk that is merely covered with snow may still be used, albeit with some difficulty if the snow is deep and has not been packed down. But while it may be inconvenient in some instances to walk on a snow covered sidewalk, it is nevertheless "practicable," and it is obviously much safer than walking in the street, where only a narrow lane may have been plowed to accommodate vehicular traffic and what little roadway is available may be covered with ice.

Accordingly, since it was "practicable" as a matter of law for Newman to use a sidewalk that had only a natural accumulation of snow lying on its surface, he had no right to walk in the street, and the policeman had probable cause to stop him and issue the ticket. The fourth amendment claim against the policeman is therefore without merit, and the derivative claims against the police chief and the village also melt away.

For the foregoing reasons the defendants' motions to dismiss are granted.

---

down. (The last measurable snowfall had been almost a week earlier, on December 21; traces had fallen on the 22d and 23d; and there had been no snow at all on the 24th, 25th, and 26th). At 5 p.m. on the afternoon of December 27, traces of snow began to fall. The snowfall increased after midnight, and by 6 a.m. on the 28th there was a total of five inches on the ground in undisturbed areas. Slightly more than one additional inch fell by noon. Thereafter, only traces fell before Newman was ticketed at approximately 5 p.m. Thus, only a bit more than three inches of fresh snow actually had fallen during the period when Newman alleges "large amounts" of snow had been deposited on the sidewalk on which he should have been walking. U.S. Dept. of Commerce, National Oceanic and Atmospheric Administration, Local Climatological Data Monthly Summary: Chicago, Illinois, at 1, 4 (December 1983).

9. Another measure in the package, for example, made it unlawful for a pedestrian who is besotted with alcohol or drugs to "walk or be upon a highway except on a sidewalk." Ill.Rev.Stat. ch. 95½, ¶ 11–1010. This obviously was aimed at safety rather than convenience since drunken pedestrians could be expected to find it considerably more difficult to maneuver down a sidewalk than a street, which is ordinarily much wider and has a stripe painted down the middle for guidance.